Reversed and remanded by published opinion. Judge MOTZ wrote the opinion, in which Judge SHEDD joined. Judge MICHAEL wrote a separate dissenting opinion.
OPINION
DIANA GRIBBON MOTZ, Circuit Judge:
Child Evangelism Fellowship of Maryland, Inc. (“CEF”) brought this suit to obtain access to certain established communication forums in public elementary schools. The district court refused to issue a preliminary injunction requiring a school district to permit CEF access to the district’s take-home flyer forum in order to distribute Good News Club flyers. The court believed that allowing CEF this access might constitute an unconstitutional establishment of religion and, for this reason, found that CEF had failed to demonstrate the necessary likelihood that it would ultimately succeed on the merits. Controlling precedent, however, strongly indicates that permitting CEF access to this forum does not run afoul of the Establishment Clause. Thus, CEF has demonstrated a clear likelihood of success on the merits. Accordingly, we must reverse and remand for further proceedings.
I.
CEF describes itself as a non-profit “Bible-centered, worldwide organization composed of born-again believers whose purpose is to evangelize boys and girls with the Gospel of the Lord Jesus Christ and to establish (disciple) them in the local church *592 for Christian living.” As one of its functions, CEF establishes Good News Clubs that meet in elementary schools throughout the country. During these meetings, the “children recite Bible verses, sing songs, play games, learn Bible stories, and pray under the leadership of trained staff who primarily are volunteers.” Beginning in 1996, the Good News Club began holding after-school meetings in the elementary schools of Montgomery County, Maryland and currently holds meetings at two schools in that school district — Mill Creek Towne Elementary School and Clearspring Elementary School.
The Montgomery County Public School District (“the District”) operates 125 elementary schools. The District permits certain governmental and non-profit organizations to use the “take-home flyer forum” in those schools to distribute flyers and permission slips for students to take home to their parents. Although the record reveals conflicting testimony regarding what policy (if any) actually guides school administrators’ discretion in granting access to this forum, community groups clearly must obtain prior administrative approval to use the forum. If approved, the organization is responsible for supplying the requisite number of flyers at its own expense.
The method of distribution varies among the schools in the District, but Mill Creek and Clearspring Elementary School employ the same basic procedure. Either a representative of the community group or the District office staff places the flyers in the teachers’ mailboxes, generally after receiving permission from the school’s principal. The teachers retrieve the flyers from their mailboxes and either personally deliver them to the students or the students’ cubbies, or have a teacher’s aide or student do so. The distribution of flyers typically occurs at the end of the school day. Students are expected to bring home all items from their cubbies including student art work, homework, classwork, other school related information, and the flyers. But nothing in the record indicates that students receive any punishment for failing to bring flyers home and parents are not required to acknowledge receipt of the flyers.
In August 2001, CEF sought to have a flyer notifying parents of the Good News Club meetings and requesting permission for their child’s attendance included in the take-home folders of students at these schools. Although the District has permitted many organizations, including several religious groups, to avail themselves of the take-home flyer forum, it denied CEF’s requests, including CEF’s offer to enclose the flyer in a sealed envelope. The District explained its refusals as rooted in the “religious nature” of the Good News Club and concerns about separation of church and state.
CEF then filed this action seeking a preliminary injunction to bar the District from refusing to include CEF’s flyer in the students’ take-home folders, and limiting access to other school forums. CEF alleged' that in refusing to allow equal access to these forums, the District engaged in discriminatory treatment in violation of the Free Speech, Free Exercise, Establishment, and Equal Protection Clauses of the United States Constitution and the parallel provisions of the Maryland Constitution. The district court granted a preliminary injunction preventing the District from denying or limiting CEF’s access to some forums — back to school nights, open houses, and bulletin boards or tables generally open to other groups.
The court, however, denied CEF’s request for a preliminary injunction with *593 respect to the take-home flyer forum.[1] Although the court determined that precedent compelled its conclusion that denying CEF this access would infringe on the group’s free speech rights, it decided that further hearings might lead it to ultimately conclude that the “establishment problem trumps [the] free [speech] problem.” Because of this “real clash of constitutional interests,” the district court held that CEF failed to demonstrate a likelihood of success on the merits.
In determining whether to grant a preliminary injunction, a court must balance: (1) the likelihood of irreparable harm to the plaintiff if the injunction is denied; (2) the likelihood of harm to the defendant if it is granted; (3) the likelihood that the plaintiff will succeed on the merits; and (4) the public interest. See Direx Israel v. Breakthrough Med. Corp., 952 F.2d 802, 812 (4th Cir.1991); Blackwelder Furniture Co. v. Seilig Mfg. Co., 550 F.2d 189, 195-96 (4th Cir.1977). We review the district court's grant or denial of a preliminary injunction for abuse of discretion, accepting the court's findings of fact absent clear error, but reviewing its conclusions of law de novo. Although CEF argues that the district court committed several legal errors in applying the preliminary injunction standard, given our conclusion as to one of these-assessment of CEF's likelihood of success on the merits-we need not reach the other asserted errors.
II.
CEF initially contends that barring Good News Club flyers from the take-home flyer forum constitutes viewpoint discrimination in violation of CEF’s free speech rights.
The parties do not dispute the facts giving rise to this argument. Between August 2001 and February 2003, the District permitted over 225 groups to access the take-home flyer forum and circulate 415 flyers. During this time, the District only denied thirty-two requests for access to this forum; of those, thirteen were excluded specifically because they were profit-driven. The approved flyers came from groups as diverse as the American Red Cross, the Shakespeare Theatre, the Montgomery County Recreation Department, the American Diabetes Association, the Audubon Naturalist Society, and the Washington Gas Company. The topics of the flyers included information about community, charitable, and education-related activities, cultural and sporting events, and health issues. MCPS even permitted religious organizations access to this forum, allowing circulation of flyers from the Salvation Army, the Holy Redeemer Summer Play School, the Norbeck Community Church, the Cedar Lane Unitarian University Church, the Jewish Community Center, the Boy Scouts, the Girl Scouts, the YMCA, and the Boys and Girls Club.
In its appellate brief, the District maintained that it legally excluded CEF’s Good News Club flyers from its take-home flyer forum. The District contended that it did not exclude the Club because of its religious viewpoint, but because the flyer forum was not open to “proselytization” or “evangelical” groups. Brief of Appellees at 57-59. At oral argument, however, the District conceded that under controlling precedent, excluding CEF’s flyers from the forum constituted unconstitutional viewpoint discrimination. This concession is well-taken.
*594 When a group seeks to speak from a religious viewpoint on a “subject otherwise permissible” in a particular forum, the government cannot constitutionally exclude the speech. Lamb’s Chapel v. Center Moriches Union Free Sch. Dist,, 508 U.S. 384, 394, 113 S.Ct. 2141, 124 L.Ed.2d 352 (1993). CEF’s flyers promote educational, cultural, and recreational activities, albeit from a religious perspective, that fit squarely within the contours of the take-home flyer forum. Given the broad access the District grants to other organizations, the Supreme Court’s recent decision in Good News Club v. Milford, 533 U.S. 98, 121 S.Ct. 2093, 150 L.Ed.2d 151 (2001), directly controls CEF’s free speech claim.
In Good News Club, Milford Central School denied the Good News Club access to its after-school facilities because it deemed the Club’s activities to be the “equivalent of religious instruction.” Id. at 104, 121 S.Ct. 2093. The Supreme Court held that this constituted viewpoint discrimination. Id. at 112, 121 S.Ct. 2093. The Court explained that “speech discussing otherwise permissible subjects cannot be excluded from a limited public forum on the ground that the subject is discussed from a religious viewpoint.” Id. Of particular interest here, the Court noted that there is “no reason to treat the Club’s use of religion as something other than a viewpoint merely because of any evangelical message it conveys.” Id. at 112 n. 4, 121 S.Ct. 2093.
The District admitted at oral argument that it excluded CEF’s flyers not because of their content, but because the group is evangelical and its predominate objective is proselytization. See also Brief of Appel-lees at 57-59. For this reason, as the District ultimately conceded, the Supreme Court’s ruling in Good News Club virtually assures CEF of success on its claim that exclusion of the flyers from the take-home flyer forum constitutes viewpoint discrimination in violation of its First Amendment free speech rights. • Accordingly, the District must justify this viewpoint discrimination with a compelling governmental interest in order to prevail. Am. Life League, Inc. v. Reno, 47 F.3d 642, 648 (4th Cir.1995).
III.
The District proffers a single as-sertedly compelling governmental'interest: it contends that permitting CEF access to the take-home flyer forum would constitute the establishment of religion in violation of the First Amendment. Assuming that violation of the Establishment Clause constitutes a governmental interest compelling enough to overcome viewpoint discrimination,[2] we believe it plain, under controlling precedent, that allowing CEF access to this forum would not be likely to violate the Establishment Clause.
The Establishment Clause provides that “Congress shall make no law respecting an establishment of religion.” U.S. Const, amend. I. The District argues that permitting CEF access to the take-home flyer forum would violate Establishment Clause principles by sending a message of government endorsement of a religious activity, County of Allegheny v. ACLU, 492 U.S. 573, 592-94, 109 S.Ct. 3086, 106 L.Ed.2d *595 472 (1989); coercing participation in a religious activity, Lee v. Weisman, 505 U.S. 577, 587, 112 S.Ct. 2649, 120 L.Ed.2d 467 (1992); and excessively entangling the government in a religious activity, Lemon v. Kurtzman, 403 U.S. 602, 613, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971).
Less than three years ago, in Good News Club, school authorities in New York presented the Supreme Court with similar arguments. They contended that any viewpoint discrimination arising from their exclusion of the Good News Club from the elementary school’s after-school facilities was permissible because permitting access would violate the Establishment Clause. Brief for Respondent at 16-26, Good News Club v. Milford, 533 U.S. 98, 121 S.Ct. 2093, 150 L.Ed.2d 151 (2001)(No. 99-2036). The Court firmly rejected these arguments.
Initially, the Supreme Court emphasized that neutrality towards religion constitutes a “significant factor in upholding governmental programs” under the Establishment Clause. Good News Club, 533 U.S. at 114, 121 S.Ct. 2093 (internal quotation marks and citations omitted). The Court explained that the “guarantee of neutrality is respected, not offended, when the government, following neutral criteria and even-handed policies, extends benefits to recipients whose ideologies and viewpoints, including religious ones, are broad and diverse.” Id. (internal quotation marks and citations omitted). Because those seeking to hold Good News Club meetings in elementary schools after hours were “seeking] nothing more than to be treated neutrally,” i.e., to obtain equal access to a forum available to other community organizations, the school administration faced “an uphill battle in arguing that the Establishment Clause compels it to exclude the Good News Club.” Id.
Although in Good News Club the Court acknowledged that it had earlier noted “in the Establishment Clause context” that “elementary school children are more impressionable than adults,” it explained that it had never suggested that “when the school was not actually advancing religion, the impressionability of students would be relevant to the Establishment Clause issue.” Id. at 115-16, 121 S.Ct. 2093. The Court further explained that even if elementary school “children would misper-ceive” affording the Good News Club access to the public elementary schools as “the endorsement of religion,” this would be no greater “danger” than the chance that “they would perceive a hostility toward the religious viewpoint if the Club were excluded.” Id. at 118, 121 S.Ct. 2093. Thus, the Court concluded that the New York school authorities could not prevail in the uphill battle to demonstrate an Establishment Clause violation, even though the case involved, as this one does, elementary school children. Id. at 115-19, 121 S.Ct. 2093.
In view of its conceded unlawful viewpoint discrimination in denying CEF access to the take-home flyer forum, the District here faces the same “uphill battle” as the school authorities in Good News Club. We recognize, however, that certain facts do distinguish the case at hand from Good News Club. In this case the Good News Club flyers would be distributed during school hours when the law requires school attendance, while in Good News Club, club meetings were held immediately after school hours. Id. at 113, 121 S.Ct. 2093. Moreover, here the students would take the flyers and permission slips home to obtain parental consent, while in Good Netas Club, no issue of this sort was litigated, the only parental consent at issue was that needed prior to attendance at Club meetings. Id. at 115, 121 S.Ct. 2093. Finally, teachers and staff would be in *596 volved in handing out CEF’s flyers, while in Good News Club, there was no “integration and cooperation” between school authorities and the Club. Id. at 116 n. 6, 121 S.Ct. 2093.
The District contends that these factual distinctions constitute important legal differences compelling adoption of its view that here, unlike Good News Club, permitting the requested equal access would constitute government endorsement, coercion, and entanglement in violation of the Establishment Clause. Those arguments might persuade us if Good News Club constituted the only relevant precedent controlling our decision. But it does not. Rather, several other cases from the Supreme Court and our own court provide clear guidance here.[3] In fact, in Board of Education of Westside Community Schools v. Mergens, 496 U.S. 226, 110 S.Ct. 2356, 110 L.Ed.2d 191 (1990), the Supreme Court rejected an Establishment Clause challenge to communications involving all of the assertedly pivotal facts distinguishing the case at hand from Good News Club. A critical examination of Mergens and other relevant precedents requires us to conclude that the factual distinctions between the two cases lack any legal significance.
A.
The District first relies on the fact that the communication here would occur during school hours when students are compelled to attend school, not after hours as in Good News Club. The essential difficulty with reliance on this difference is that simply issuing a communication involving a religious organization during school hours does not render the communication state speech, nor does it invariably create a perception of endorsement or coercion by government officials. Peck v. Upshur County Bd. of Educ., 155 F.3d 274, 282-83 (4th Cir.1998).
For example, in Mergens, 496 U.S. at 247, 110 S.Ct. 2356, the Supreme Court held that the Equal Access Act required a high school to grant “official recognition” to a student Christian club. More importantly for our purposes, the Court found that this requirement did not contravene the Establishment Clause even though under the school’s policy, “official recognition” allowed the Christian club access to the school newspaper, bulletin boards, and public address system, id. at 247, 253, 110 S.Ct. 2356; and even though, as we later noted, “Undoubtedly, the distribution of the school newspaper, student viewing of school bulletin boards, and announcements *597 over the public address system ... all occurred during school hours.” Peck, 155 F.3d at 282 (emphasis added). Similarly, in Brown v. Gilmore, 258 F.3d 265, 272, 278, 282 (4th Cir.2001), we held that requiring a minute of silence during school hours did not violate the Establishment Clause even when the classroom teacher advised students that the time could be used for prayer. And in Peck, 155 F.3d at 282, 288, we found that allowing private entities to offer Bibles to secondary school students during school hours did not violate the Establishment Clause.
Like the communications at issue in Mergens, Brown, and Peck, the CEF flyers would be distributed during “non-instructional” time (at the end of the school day), and nothing suggests that the flyers would be part of the curriculum or integrated into the teacher’s instruction. Accordingly, the timing of the flyer distribution — that it would take place during school hours- — cannot serve as a legally cognizable distinction from Good News Club.[4]
B.
The second basis on which the District argues Good News Club legally differs from the case at hand focuses on the level of student “coercion.” Parental consent was a necessary prerequisite to attending the after-school Christian club meetings in Good News Club, as it is here. The District, however, maintains that requiring students to bring CEF’s informational flyers and permission slips home to their parents (an issue apparently not litigated in Good News Club) would amount to unconstitutional coercion.
But, of course, school administrators can “coerce” student action of all kinds without engaging in unconstitutional coercion; they can even require student contributions to a fund that ultimately supports a religious organization without running afoul of the Establishment Clause. Rosenberger v. Rector & Visitors of Univ. of Va., 515 U.S. 819, 841-46, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995). Thus, the critical question here is not just whether the District would be “coercing” students to distribute CEF’s flyers (which, in the broadest sense of the term, it would), but whether that translates into unconstitutional government coercion in violation of the Establishment Clause.
To resolve this question, we must determine whether the District would be coercing students “to support or participate in religion or its exercise, or otherwise act in a way which establishes a [state] religion or religious faith, or tends to do so.” Lee, 505 U.S. at 587, 112 S.Ct. 2649 (internal quotation marks and citations omitted). The Supreme Court has only found unconstitutional government coercion when the government singled out a religious group for a special benefit not afforded to other similarly situated non-religious groups and advanced an inherently religious activity, such as prayer. See, e.g., Santa Fe Indep. *598 Dist. v. Doe, 530 U.S. 290, 302-13, 120 S.Ct. 2266, 147 L.Ed.2d 295 (2000); Lee, 505 U.S. at 587-99, 112 S.Ct. 2649. Conversely, when the government has merely provided a religious group with access equal to that afforded similar non-religious groups and has not advanced an inherently religious activity, the Court has uniformly refused to find unconstitutional government coercion. See, e.g., Rosenberger, 515 U.S. at 841-46, 115 S.Ct. 2510; Mergens, 496 U.S. at 251, 110 S.Ct. 2356.
Relevant Supreme Court case law thus indicates that these two factors should serve as guides in “draw[ing] the line[]” between the competing constitutional guarantees at issue here — permissible accommodation of private religious beliefs and impermissible government establishment of religion. See Rosenberger, 515 U.S. at 847-48, 115 S.Ct. 2510 (O’Connor, J., concurring). Thus, first, and perhaps most importantly, we look to the context in which the assertedly coerced activity occurs: in particular, whether the government is granting preferential treatment to a religious organization or merely providing equal access. Second, we must also examine the character of the activity itself: in this case, the student distribution of CEF’s informational flyer.
1.
To determine whether government has engaged in unconstitutional coercion, we must initially view the purportedly coerced activity in context. See, e.g., Zelman v. Simmons-Harris, 536 U.S. 639, 656, 122 S.Ct. 2460, 153 L.Ed.2d 604 (2002) (explaining that in assessing whether Ohio’s voucher program imposes unconstitutional coercion, “[t]he Establishment Clause question ... must be answered by evaluating all options Ohio provides Cleveland schoolchildren, only one of which is to obtain a scholarship and then choose a religious school”) (emphasis in original); Lynch v. Donnelly, 465 U.S. 668, 680, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984) (determining whether a city-erected holiday display, which included a créche, violated the Establishment Clause and refusing to consider the créche in isolation because “[f]o-cus[ing] exclusively on the religious component of any activity would inevitably lead to its invalidation under the Establishment Clause”).
In an equal access case, like this one, context is particularly revealing because providing access to a “broad ... spectrum of groups is an important index of secular [rather than religious] effect.” Widmar v. Vincent, 454 U.S. 263, 274, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981); accord Rosenberger, 515 U.S. at 843—44, 115 S.Ct. 2510.[5] Indeed, the Supreme Court has never found unconstitutional coercion in an equal access case. See, e.g., Rosenberger, 515 U.S. at 841-42, 115 S.Ct. 2510; Mergens, 496 U.S. at 251, 110 S.Ct. 2356. This does not mean that an equal access case could not pose Establishment Clause concerns, but only that equality of treatment is critical when assessing whether government authorities have properly “aceommo-dat[ed]” private “religious beliefs” or engaged in unconstitutional coercion by pervasively involving themselves in religious activity, so as to “creat[e] a state-sponsored and state-directed religious exercise *599 in a public school.” Lee, 505 U.S. at 586-87, 112 S.Ct. 2649.
Here, it is evident that requiring participation in the take-home flyer forum does not single out CEF for a special benefit not afforded other similarly situated groups. As participants in the take-home flyer forum, students are asked to retrieve (with the hope they will take home) a variety of materials including their homework, classwork, art work, other school-related information, and flyers from more than 225 organizations. Over the course of a year-and-a-half, students received approximately 415 flyers promoting environmental, athletic, artistic, and religious activities. Directing them to take home these diverse materials does not coerce them to engage in a religious activity, any more than it coerces them to engage in an environmental activity.[6] Cf. Widmar, 454 U.S. at 274, 102 S.Ct. 269 (agreeing that an open access policy including a religious group “would no more commit the University ... to religious goals than it is now committed to the goals of the Students for a Democratic Society, the Young Socialist Alliance, or any other group eligible to use its facilities”) (internal quotation marks and citation omitted).
Thus, just as the government does not “coerce” a religious activity by requiring students to pay fees used to fund expenses of all student publications, including a magazine established to “provide a unifying focus for Christians,” Rosenberger, 515 U.S. at 826, 842, 115 S.Ct. 2510, so too it does not “coerce” a religious activity by requiring students to take home a host of flyers and other materials, including CEF’s informational flyer. See also Mer-gens, 496 U.S. at 247, 251, 110 S.Ct. 2356 {requiring students to listen to all student announcements, including an announcement inviting students to-an after-school religious club meeting, does not amount to unconstitutional coercion).
2.
Looking beyond this broader context to the character of the particular “coerced” activity at issue further demonstrates that requiring students to pick up CEF’s flyer and bring it home simply does not require them to “support or participate in religion or its exercise.” Lee, 505 U.S. at 587, 112 S.Ct. 2649 (emphasis added). Unlike the cases in which the Supreme Court has found unconstitutional coercion, students here would not be participating in an inherently religious activity. They would not be forced to engage in any formal religious exercise; they would not be made to read the Bible or to pray, nor would they be bound to sit by while other students or faculty pray. See Santa Fe, 530 U.S. 290, 120 S.Ct. 2266, 147 L.Ed.2d 295; Lee, 505 U.S. 577, 112 S.Ct. 2649, 120 L.Ed.2d 467; Mellen, 327 F.3d 355. They would not be required, or even encouraged, to accept a religious tract, or asked to read or listen to a religious message. See Berger v. Rensselaer Cent. Sch. Corp., 982 F.2d 1160, 1164 (7th Cir.1993). In fact, as the District expressly (and properly) acknowledged at oral argument, CEF’s flyers contain no evangelical or overtly religious language.
We recognize, of course, that the flyers can be characterized as an invitation to participate in a religious activity. Howev *600 er, our precedents make clear that receipt of an invitation to a religious activity (with the hope that students will deliver the invitation to their parents) simply does not rise to the level of “support or participation] in religion or its exercise.”[7] Cf. Mergens, 496 U.S. at 247, 110 S.Ct. 2356 (holding, in the face of an Establishment Clause challenge, that school authorities could require students to listen to the public address announcement inviting them to an after-school religious club); Brown, 258 F.3d at 278 (rejecting Establishment Clause challenge even though teachers required students to remain in their classroom while learning of an invitation to use a minute of silence to pray). That neither Mergens nor Brown required the students to deliver the invitation to their parents does not lessen their force here because delivery does not convert an invitation into a religious act. A student who receives a Good News Club flyer and delivers it to his parents is no more engaging in a religious activity than a child who receives the same flyer from a street-corner evangelist and turns to give it to his mother. In both of these cases, the children are merely delivering an invitation to participate in a religious activity, not engaging in that activity.[8]
The Supreme Court itself has implicitly recognized the importance of this distinction. In Santa Fe, the Court found unconstitutional coercion of religion when a school, after school hours, broadcast prayer (an inherently religious activity) over its public address system, 530 U.S. at 307-08, 120 S.Ct. 2266, while in Mergens, the Court found no • constitutional problem *601 when a school, during school hours, broadcast an announcement merely inviting students to participate in a religious activity over the same medium — the public address system, 496 U.S. at 247, 110 S.Ct. 2356.
In sum, requiring students to carry home, among other items, a flyer containing an invitation to participate in a religious activity — an invitation that cannot be accepted absent parental consent — does not coerce religious activity in violation of the Establishment Clause. Indeed, if requiring students to bring home this invitation can be deemed coercion of a religious activity solely because the ultimate goal of the organization initiating the distribution is of a religious character, then a number of the other flyers that the District required children to carry home (e.g., from the Holy Redeemer Nursery School, the Academy of the Holy Cross, Catholic University, Columbia Union College, the Nor-beck Community Church, Cedar Lane Unitarian University Church, the Jewish Community Center, the Salvation Army, the Boy Scouts, the Girl Scouts, the YMCA, and the Boys and Girls Club) would also violate the Establishment Clause. Tellingly, neither the District nor the dissent so contend.
C.
Finally, the District emphasizes the school’s “plenary control” over the take-home flyer forum, and the teachers’ “active” role in picking up the flyers from their mailboxes and distributing them to the students, contrasting these facts to the lack of “integration and cooperation” between school authorities and the Club in Good News Club, 533 U.S. at 116 n. 6, 121 S.Ct. 2093. Because of the teachers’ greater role here, the District maintains that affording CEF access to the take-home flyer forum would constitute unconstitutional endorsement of religion and would unconstitutionally entangle the school authorities in a religious activity.
But, once again, precedent teaches otherwise. In Mergens, the school authorities certainly had “plenary control” over the public address system. Moreover, the provisions of the Equal Access Act under attack in Mergens permit teachers to perform a custodial over-sight function to maintain order and énsure good behavior during religious after-school meetings. 496 U.S. at 253, 110 S.Ct. 2356. Yet in Mergens, the Supreme Court upheld the Equal Access Act and concluded that this teacher involvement did not impermissibly entangle government officials in the administration of religious activities or otherwise violate the Establishment Clause. Id.
The District attempts to distinguish Mergens by characterizing the teacher involvement there as “non-participatory” compared to the teachers’ “active” role in this case. But, when we examine the substance of the teachers’ participation, the teachers’ role in Mergens arguably raises more endorsement and entanglement concerns than their involvement here. Under the statute upheld in Mergens, teachers would actually be present during the religious meetings in a disciplinary capacity. 496 U.S. at 253, 110 S.Ct. 2356. Thus, from a student’s perspective, his public school teacher would not only attend a religious club’s meeting, but would play a truly “active” role when students misbehaved. See also Brown, 258 F.3d at 278 (holding that teacher could engage in a more participatory role than that involved in this case, i.e., advising students of their option to pray during the mandatory minute of silence). Here, in contrast, teachers only act in an administrative capacity— picking up flyers from their mailboxes and distributing them to students’ cubbies. And, as part of this same administrative function, teachers also distribute students’ *602 homework, classwork, and flyers from other “non-proselytizing” religious organizations and secular groups. It is not even clear that students witness the distribution. This minimal activity certainly involves no more endorsement or entanglement than the teachers’ duties in Mergens or Brown, and therefore does not meaningfully distinguish this case from Good News Club.
The District also attempts to distinguish Mergens based on the age of the students, but, as noted above, in Good News Club itself the Supreme Court rejected the “suggestion that, when [as here] the school was not actually advancing religion, the impressionability of students would be relevant to the Establishment Clause issue.” Good News Club, 533 U.S. at 116, 121 S.Ct. 2093; see ante at 9; see also Brown, 258 F.3d at 277 (upholding, on basis of Good News Club, statute requiring mandatory minute of silence in elementary schools).[9]
D.
In sum, we see no meaningful way to distinguish this case from controlling precedents. Case law teaches that, notwithstanding the time and manner of the flyer distribution, allowing CEF access to the take-home flyer forum would not likely violate the Establishment Clause.[10]
IV.
For all of these reasons, we must reverse the district court’s denial of a preliminary injunction and remand the case for further proceedings in accordance with this opinion.

REVERSED AND REMANDED

. The district court also denied access to the "school wall forum,” but CEF has not appealed this denial.

. In Good. News Club, the Court acknowledged that "a state interest in avoiding an Establishment Clause violation may be characterized as compelling,” and therefore "may justify content-based discrimination," but noted that "it is not clear whether a State's interest in avoiding an Establishment Clause violation would justify viewpoint discrimination.” 533 U.S. at 112-13, 121 S.Ct. 2093 (internal quotation marks and citations omitted).

. Although not binding on us, we note that our holding accords with that of most other courts, which have held that a public elementary school does not violate the Establishment Clause by similar distributions of flyers from private religious organizations. See Hills v. Scottsdale Unified Sch. Dist., 329 F.3d 1044 (9th Cir.2003) (distribution of religious summer camp brochures would not violate Establishment Clause); Sherman v. Cmty. Consol. Sch. Dist. 21, 8 F.3d 1160 (7th Cir.1993) (distribution of Boy Scout materials did not violate Establishment Clause); Child Evangelism Fellowship v. Stafford Township Sch. Dist., 233 F.Supp.2d 647 (D.N.J.2002) (distribution of Good News Club flyers would not violate Establishment Clause); Daugherty v. Vanguard Charter Sch. Acad., 116 F.Supp.2d 897 (W.D.Mich.2000) (distribution of religious groups’ materials did not violate Establishment Clause). Some courts, however, have held to the contrary; we do not find their rationales persuasive, and not even the dissent relies on these cases. See Culbertson v. Oakridge Sch. Dist., 258 F.3d 1061 (9th Cir.2001) (holding, with little discussion, that distribution of Good News Club permission slips would violate Establishment Clause); Rusk v. Crestview Local Sch., 220 F.Supp.2d 854 (N.D.Ohio 2002) (failing to distinguish Good News Club when holding that distribution of church advertisements violated the Establishment Clause and prohibiting these distributions did not violate the Free Speech Clause).

. Nor does the District strengthen its argument by asserting that CEF is "us[ing] the authority of the state, through its compulsory attendance law, to provide a captive audience for the Club’s advertising.” Brief of Appel-lees at 28. The Supreme Court rejected precisely this argument in Mergens, 496 U.S. at 249, 110 S.Ct. 2356 (noting that petitioner contended that “because the State's compulsory attendance laws bring the students together (and thereby provide a ready-made audience for student evangelists), an objective observer in the position of a secondary school student will perceive official school support for such religious meetings”), as did we in Peck, 155 F.3d at 282 (noting that appellants argued that making Bibles available “during school hours when state law mandates student attendance” would compel “a ‘captive audience' of students to receive the religious message”). Precedent, therefore, requires us to reject it here.

. Thus, the prayer cases, on which the District so heavily relies, do not provide an appropriate analogue. Those cases did not involve equal access; rather, government officials there granted an inherently religious activity (prayer) sole access to student audiences. See Santa Fe, 530 U.S. 290, 120 S.Ct. 2266, 147 L.Ed.2d 295; Lee, 505 U.S. 577, 112 S.Ct. 2649, 120 L.Ed.2d 467; Mellen v. Bunting, 327 F.3d 355 (4th Cir.2003); see also Lee, 505 U.S. at 586, 112 S.Ct. 2649 (recognizing the distinction between ''accommodation” cases and "prayer and religious exercise” cases).

. Of course, there is a constitutional "difference ... between coercing religious activity and coercing environmental activity,” post at 603, but that does not in any way diminish the force of this comparison — -just as requiring students to carry home an environmental flyer does not make the delivery of that flyer an environmental activity, so too requiring them to carry home a religious flyer does not make that delivery, in and of itself, a religious activity.

. To the extent that our friend in dissent seeks to characterize the students as "participating in” or "supporting” CEF's religious activity, i.e. distributing flyers with a religious purpose, this argument also fails. As support for this argument, the dissent relies exclusively on cases recognizing a religious group's Free Exercise right to distribute religious tracts and flyers. See post at 604-05. But none of the dissent's cases suggest, let alone hold, that a person "participates in” or "supports” "religion or its exercise,” simply by receiving flyers and passing them on to another person. Indeed, any such argument would be foreclosed by Mergens. For there, students were also "coerced” to "participate in” or "support” a religiously motivated person's issuance of an invitation to attend an after-school religious club meeting. But, despite this, the Court found "little, if any, risk of official state ... coercion.” Mergens, 496 U.S. at 251, 110 S.Ct. 2356; see also id. at 261, 110 S.Ct. 2356 (Kennedy, J., concurring) (explaining that "enforcement of the [Equal Access Act] will [not] result in the coercion of any student to participate in a religious activity”).
The sole rationale the dissent offers for disregarding Mergens is that the students in Mer-gens could sit "passively” when listening to the "religious” announcement, while here students would be forced to take a "demonstrative act.” See post at 608. This minor factual difference is of no legal consequence. For a student's act need not be "demonstrative” to constitute participation in, or support of, a religious activity. After all, as the dissent itself recognizes, in Lee the Court held that students were forced to participate in a religious activity — prayer—even though they merely sat passively while other students prayed around them. See post at 605-06 (citing Lee, 505 U.S. at 593, 112 S.Ct. 2649; id. at 637, 112 S.Ct. 2649 (Scalia, J., dissenting)).

. The dissent disagrees, contending that both the student and the hypothetical child are, in fact, engaging in a "religious” activity by actively distributing the flyers. But, although a child can certainly “participate in a religious activity without having any religious motivation for his participation,'’ see post at 606 (emphases added), religious motivation is essential to characterizing the activity itself as religious. Otherwise, under the dissent’s expansive definition, a mailman would be engaging in a "religious” activity every time he delivered a religious flyer or pamphlet. That the mailman is not "coerced to deliver any mail,” post at 607 n.*, is immaterial because the presence of coercion does not transform an otherwise secular activity into a religious act.

. Moreover, because in the case at hand students would never view the flyers without parental consent (since CEF will place them in sealed envelopes), the age of the students is constitutionally immaterial. Cf. Peck, 155 F.3d at 287 n. * (reluctantly distinguishing among elementary and secondary school students when Bibles were immediately accessible to the students). As in Good News Club, parents control whether their children have access to the flyers, and as a result parents constitute the relevant audience for Establishment Clause purposes. Because parents are less likely than secondary school students to believe school authorities endorse religion by granting CEF equal access, there is even less concern of perceived endorsement here than in Mergens. Compare Good News Club, 533 U.S. at 115, 121 S.Ct. 2093 with Mergens, 496 U.S. at 250, 110 S.Ct. 2356.

. Because we hold that CEF is entitled to preliminary relief on its claim under the Free Speech Clause, we do not address its other constitutional challenges.