CHILD EVANGELISM FELLOWSHIP OF MARYLAND, INC., et al. Plaintiffs

v.

MONTGOMERY COUNTY PUBLIC SCHOOLS, et al. Defendants

No. CIV. PJM 03-162.

United States District Court, D. Maryland.

March 24, 2005.

Steven H. Aden, Esquire, Annandale, VA, H. Robert Showers, Jr., Esquire, Leesburg, VA, for Plaintiffs.

Eric Charles Brousaides, Esquire, Judith S. Bresler, Esquire, Columbia, MD, for Defendants.

### OPINION

MESSITTE, District Judge.

### I.

This case returns to court on remand from the Fourth Circuit, which reversed this Court's partial denial of preliminary injunctive relief to Plaintiffs Child Evangelism Fellowship of Maryland, Inc. and Child Evangelism Fellowship of Northwest Maryland (collectively "CEF"). CEF has filed a Motion for Summary Judgment and Defendants Montgomery County Public Schools, Superintendent Jerry D. Weast, and members of the County School Board in their official capacities (collectively "MCPS") have filed a Motion to Dismiss.

At oral argument on these Motions, the Court thought it might be appropriate for CEF to seek further preliminary injunctive relief until such time as the Court could write an opinion on the merits of the case. CEF has now filed such a motion, which MCPS opposes.[1]

Having considered the pleadings and the record, however, the Court has determined that it is able to proceed directly to consideration of CEF's Motion for Summary Judgment and MCPS's Motion to Dismiss without the need to consider interim relief.

Accordingly, the Court will DENY CEF's Motion for Summary Judgment and GRANT IN PART and DENY IN PART its Renewed Motion for Permanent Injunction or Alternative Relief. It will GRANT IN PART and DENY IN PART the Motion to Dismiss of MCPS.

### II.

A) The background of this litigation is set forth in *Child Evangelism Fellowship of Maryland, Inc., et al. v. Montgomery County Public Schools, et al.,* 373 F.3d 589 (4th Cir.2004) (hereinafter "*Child Evangelism Fellowship of Maryland, Inc.*").

In brief, CEF is a non-profit nondenominational Christian organization which teaches children ages six to twelve moral values from a religious viewpoint. As one of its functions, it establishes Good News Clubs at public elementary schools that meet during times when the schools are open for use by community groups. In these clubs, the children recite Bible verses, learn Bible stories, and pray under the leadership of trained staff who are primarily volunteers. The clubs also include recreational activities such as playing games and singing songs. In order to attend club meetings, children must have parental permission.

---

1. CEF's responsive pleading is styled "Renewed Motion for Permanent Injunction or, in the Alternative, A Preliminary Injunction as to the Take Home Flyer Forum and a Permanent Injunction As to All Other Fora."

MCPS operates public schools in Montgomery County, Maryland, including Millcreek Towne Elementary School and Clearspring Elementary School.

For some time, MCPS has permitted certain nonprofit community organizations to participate in back-to-school nights, open houses, and bulletin board displays at its schools as well as to submit flyers for students to take home to their parents. To use these fora, the community groups have been required to obtain prior approval from MCPS officials.

Prior to the present litigation, MCPS refused to grant CEF access to any of these fora based on what MCPS understood to be the evangelical and proselytizing nature of CEF's activities. In consequence, CEF brought the suit alleging that MCPS had unconstitutionally abridged its free speech rights under the First Amendment.

By the time the case came on for oral argument before the Court, MCPS had agreed as a matter of policy that CEF would have equal access to back-to-school nights, open houses, and bulletin boards. That agreement was incorporated into this Court's preliminary injunction and was in no way modified by the Fourth Circuit when the case subsequently went up on appeal. *Id.* at 592.

During the initial phase of the litigation, MCPS did not have a published policy with regard to access that outside community groups might have to the so-called "take-home flyer forum." As a matter of practice, however, MCPS permitted certain governmental and non-profit groups to use that forum, again with the requirement

that they first obtain administrative approval from MCPS.[2] Typically, as regards this forum, a representative of the community group or MCPS staff would place the flyers in the mailboxes of teachers, who would then deliver them to the students or the students' cubbies. *Id.* When CEF sought to use the forum so that students might carry home its flyers regarding the Good News Clubs meetings, MCPS denied the request, explaining its refusal as rooted in the 'religious nature' of the Good News Club and concerns about separation of church and state. *Id.*

CEF then sought a preliminary injunction in this Court that would order MCPS to grant it access to the take-home flyer forum. The Court denied CEF's request, finding that, even if the denial of access infringed CEF's free speech rights, the Court's ultimate conclusion in the case might well be that CEF's free speech rights would be trumped by the First Amendment's prohibition against the establishment of religion.

On appeal, in a two to one vote, a three-judge panel of the Fourth Circuit reversed the Court's decision. The majority noted *inter alia* "the broad access the District grants to other organizations," *id.* at 594, and, marking the concession of MCPS that CEF had been excluded because it was "evangelical" and because "its predominate objective is proselytization," found viewpoint discrimination, triggering application of the compelling governmental interest test. *Id.* No compelling governmental interest was found. Moreover, the majority found that "allowing CEF access to this forum would not be likely to violate the Establishment Clause." *Id.* Accordingly the case was remanded to this Court for

**2.** "Although the record reveals conflicting testimony regarding what policy (if any) actually guides school administrators' discretion in granting access to this forum, community groups clearly must obtain prior administrative approval to use the forum. If approved, the organization is responsible for supplying the requisite number of flyers at its own expense." *Id.*

further proceedings in accordance with the panel's decision.

B) Since the case has returned to this Court, there has been a significant development. In July 2004, approximately one month following the Fourth Circuit's decision, MCPS adopted modifications to MCPS Policy CNA, relating to "Informational Material and Announcements."[3] MCPS submits that, with respect to bulletin board/back-to-school night/open house access, the revised policy carries forward exactly what MCPS committed to at the beginning of this litigation. That is, CEF retains the same access to these three fora generally open to other groups. As a result, insofar as those fora are concerned, MCPS suggests that the issue is moot and that no permanent injunctive relief is necessary. As to the take-home flyer forum, MCPS argues that its policy has been materially revised since the case was remanded, such that its restrictions are now speaker-based as opposed to content-based, with the result that the rational governmental interest test applies—a test, says MCPS, that its revised policy satisfies.

■ CEF contends that, as to the fora other than the take home flyer forum, the issue is not moot since MCPS may well change its policy at any time; therefore permanent injunctive relief remains appropriate. As for the revised policy involving take home flyers, CEF says the policy continues to discriminate against it based on its viewpoint and, even if it does not, that the revised policy as to access to that forum is also subject to change which could discriminate against it. Additionally, CEF asks the Court to award it nominal damages and attorneys fees and costs pursuant to 42 U.S.C. § 1988 to compensate for the illegal conduct of MCPS in preventing CEF's access to all the school fora heretofore. MCPS asserts Eleventh Amendment immunity as to the damages claim, a defense which CEF in turn says MCPS has waived by engaging in this litigation for some two years. MCPS has not addressed CEF's request for attorneys fees and costs incurred in connection with its successful pursuit in the Fourth Circuit of the preliminary injunction with respect to the take-home flyer forum.[4]

---

3. A revised regulation, CNA–RA, was adopted on December 20, 2004.

4. Insofar as CEF was successful in the Fourth Circuit in its pursuit of preliminary injunction with respect to the take-home flyer forum, the Court finds CEF to be the prevailing party in this respect and entitled to such fees and costs. Although the Fourth Circuit has not officially taken a position on the matter, other circuits have held that a plaintiff may obtain prevailing party status under 42 U.S.C. § 1988 without obtaining a final favorable judgment in a challenge to unlawful conduct if the plaintiff obtains a preliminary injunction and defendant voluntarily ceases the unlawful conduct in response to the litigation, effectively depriving plaintiff of the opportunity to obtain a final determination on the merits. See e.g. Haley v. Pataki, 106 F.3d 478, 483–84 (2d Cir.1997) (allowing plaintiffs, who had obtained preliminary injunction pursuant to their 42 U.S.C. § 1983 challenge to defendant's alleged unlawful conduct, to obtain prevailing party status even though defendant's subsequent compliance with injunction and passage of legislation mooted plaintiffs' § 1983 challenge; injunction held to be a determination on the merits); see also Maloney v. Marietta, 822 F.2d 1023, 1024 (11th Cir.1987) (preliminary injunction in voting rights case vacated as moot following voluntary compliance by defendants; fees properly awarded to plaintiffs as prevailing parties); Taylor v. Ft. Lauderdale, 810 F.2d 1551, 1558 (11th Cir.1987) (same, where City passed mooting ordinance following entry of preliminary injunction).

Accordingly, the Court will entertain a petition from CEF in the next 30 days seeking attorneys fees and costs from the inception of this suit through the Fourth Circuit decision of June 2004.

The Court deals with CEF's damages claim first.

## III.

■ CEF seeks nominal damages for the inconvenience caused by MCPS's denial of its right to access to all fora as found by the Fourth Circuit. In support of its claim CEF cites, among other cases, *Park v. Shiflett,* 250 F.3d 843, 854 (4th Cir.2001) (holding plaintiff entitled to nominal damages for violation of his Fourth Amendment rights) and *Piver v. Pender County Bd. of Educ.,* 835 F.2d 1076, 1082 (4th Cir.1987) (allowing nominal damages for violation of school teacher's First Amendment rights).

MCPS pleads sovereign immunity, citing the Eleventh Amendment and *Federal Maritime Comm'n v. South Carolina Ports Auth.,* 535 U.S. 743, 766, 122 S.Ct. 1864, 152 L.Ed.2d 962 (2002).

Although CEF disputes that MCPS is a state agency entitled to the defense of sovereign immunity, the Court is satisfied that extensive case law establishes just the contrary: MCPS is a state agency which enjoys sovereign immunity. *See McNulty v. Bd. of Educ. of Calvert County,* 2004 WL 1554401, *4 (D.Md.) ("This court has made clear, consistently and repeatedly, that county boards of education of· Maryland are state agencies and therefore immune under the Eleventh Amendment from suit for monetary damages."); *Lewis v. Board of Education of Talbot County,* 262 F.Supp.2d 608, 612–14 (D.Md.2003); *Adams v. Calvert County Pub. Schools,* 201 F.Supp.2d 516, 521 (D.Md.2002); *Biggs v. Bd. of Educ. of Cecil County,* 229 F.Supp.2d 437, 444 (D.Md.2002); *Jones v. Frederick County Bd. of Educ.,* 689 F.Supp. 535, 538 (D.Md.1988); *Bd. of Educ. of Prince George's County v. Prince George's County Educators' Ass'n,* 309 Md. 85, 522 A.2d 931, 936, n. 3 (1987); *Montgomery County Educ. Ass'n v. Bd. of Educ. of Montgomery County,* 311 Md. 303, 534 A.2d 980, 987 (1987); *Bd. of Educ. of Montgomery County v. Montgomery County,* 237 Md. 191, 205 A.2d 202, 205 (1964).

· Eleventh Amendment· immunity applies not only to all forms of relief, legal and equitable,· directly against the state or its instrumentalities; the law is clear that individuals sued in their official capacity as state agents, as members of the MCPS School Board have been here, cannot be held liable for damages or retrospective injunctive relief. *Lewis v. Bd. of Educ. of Talbot County,* 262 F.Supp.2d at 612.

MCPS,\ therefore, begins with a cloak of sovereign\immunity.

■ Assuming, that to be so, CEF argues that MCPS has waived this immunity by engaging in litigation thus far and cites a number of cases. \See, e.g., Gunter v. Atl. Coast Line R.R. Co.,\ 200 U.S. 273, 284, 26 S.Ct. 252, 50 L.Ed. 477 (1906) ("[H]ence where a State voluntarily becomes a party to a cause and submits its rights·for judicial determination, it will be bound thereby and cannot escape the result of its own voluntary act by invoking the prohibitions of the· Eleventh Amendment." *Gunter,* 200 U.S. at 284, 26 S.Ct. 252 (finding waiver where state sues in federal court); *see also College Sav. Bank v. Fla. Prepaid Postsecondary Ed. Expense Bd.,* 527 U.S. 666, 670, 119 S.Ct. 2219, 144 L.Ed.2d 605 (1999), *citing Clark v. Barnard,* 108 U.S. 436, 447–48, 2 S.Ct. 878, 27 L.Ed. 780 (1883) (holding that state's voluntary appearance in federal court avoids sovereign immunity inquiry). .

The Court finds that MCPS· has not waived its sovereign immunity. While a governmental entity possessing sovereign immunity may undoubtedly waive it by ·engaging in extensive litigation, the Court agrees with MCPS that this is in effect the first time in the litigation that the issue of

damages has actually come into play. All prior activity in the case centered on CEF's request for prospective injunctive relief on a preliminary basis, as to which the sovereign immunity defense would be inapplicable. *See Ex Parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908); *Edelman v. Jordan,* 415 U.S. 651, 668, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974). In other words, there has really been no occasion for MCPS to argue the defense. Inasmuch a waiver of sovereign immunity is not to be taken lightly, *cf. Port Authority Trans–Hudson Corp. v. Feeney,* 495 U.S. 299, 305–06, 110 S.Ct. 1868, 109 L.Ed.2d 264 (1990), the Court finds that MCPS's assertion of the immunity defense at this juncture remains timely. *See Ford Motor Co. v. Dep't of Treasury,* 323 U.S. 459, 466–67, 65 S.Ct. 347, 89 L.Ed. 389 (1945); *Edelman,* 415 U.S. at 677–78, 94 S.Ct. 1347.

In consequence, CEF's request for damages pursuant to 42 U.S.C. § 1983 will be denied.

## IV.

■ A) The parties agree that, as a general proposition, "withdrawal or alteration of administrative policies can moot an attack on those policies." *Bahnmiller v. Derwinski,* 923 F.2d 1085, 1089 (4th Cir. 1991); *see also Commonwealth of Virginia v. Califano,* 631 F.2d 324 (4th Cir.1980). They also agree that the party asserting mootness must not only demonstrate that an appropriate change has occurred but that the challenged conduct cannot reasonably be expected to recur. *Friends of the Earth, Inc. v. Laidlaw Envt'l Services (TOC), Inc.,* 528 U.S. 167, 189, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000).

In the present case, while CEF acknowledges that MCPS's revised policy *vis-a-vis* back-to-school nights, open houses, and bulletin boards may grant it full access, there is no guarantee that MCPS will not change its policy and deny it access once again. As for the take-home flyer forum, CEF maintains that the revised policy continues to result in impermissible viewpoint discrimination and in any event is also subject to future change.

1) The Court considers first the matter of back-to-school night/open house/bulletin board access.

There is no question that counsel for MCPS, in a letter to counsel for CEF dated April 8, 2003, stated that the MCPS intended by its policy to grant full access to CEF in connection with these fora:

As discussed on April 2, 2003, defendants are in the process of clarifying and codifying its procedures concerning the distribution of information from community groups. The absence of a written procedure has resulted in inconsistent practices in this regard. Accordingly, I am writing to clarify defendants' position regarding the distribution/display of information from Good News Clubs and to narrow the issues for litigation. As you know, Good News Clubs have been permitted to staff its tables. To the extent that other community groups are permitted to have display boards on their tables or posters on the wall behind their tables at back-to-school nights and open houses, the Good News Club will be permitted to have display boards or hang posters. If a given school has a bulletin board or table on which community groups may post or leave a flyer or brochure, the Good News Club may also post or leave a flyer or brochure. Given the foregoing, it is my understanding that the only issue remaining concerns the distribution of the Good News Club's flyers in students' take home folders/backpacks. I will assume that this is also your understanding if I do not hear from you otherwise by April 10, 2003.

As noted earlier, the Court incorporated terms to this effect into that part of the preliminary injunction that granted CEF relief.

The Court finds that Revised MCPS Policy CNA and Regulation CNA–RA carry this same right of access forward. The Revised Policy identifies certain limited categories of organizations that may have their informational materials and announcements approved "for display or for distribution directly to students [*i.e.* the take home flyer forum]." These include:

a) Montgomery County Public Schools;

b) Agencies/departments within the county, state or federal government;

c) Parent Teacher Associations/organizations;

d) Licensed day care operating on school campus (*sic* ); and

e) Nonprofit organized youth sports leagues.

The Revised Policy and Regulation also provide that "any other organization" may have its informational materials or announcements approved *for display only* (*i.e.* not for distribution directly to students) if the activity or event primarily concerns one of the following topics:

a) Educational services directly related to the school system's instructional program, such as test preparation courses and enrichment courses;

b) Student health, safety or welfare;

c) Community sports or cultural activities (non-profit); and

d) Licensed day care.

With regard to the "display only" category, MCPS concedes that "[i]n light of existing judicial precedent regarding the Free Speech Clause of the First Amendment, [CEF] will be permitted under this new policy to display their flyers in the same manner as other approved organizations." Although CEF suggests that the policy "governs only the display or distribution of flyers in MCPS facilities, [and] has no bearing on back-to-school nights and open houses," MCPS insists that CEF is "mistaken." MCPS unquestionably affirms that "it is clear that the policy and regulation [apply] to the dissemination of informational materials to back-to-school nights, open houses, etc."

The Court finds further debate on the point unnecessary. The Court accepts MCPS's affirmation as a binding judicial admission as to what revised Policy CNA and Regulation CNA–RA mean. *See Lucas v. Burnley*, 879 F.2d 1240, 1242 (4th Cir.1989) ("The general rule is that 'a party is bound by the admissions of [the] pleadings.' "); *Brown v. Tennessee Gas Pipeline Co.*, 623 F.2d 450, 454 (6th Cir. 1980) ("Under federal law, stipulations and admissions in pleadings are generally binding on the parties and the Court.").[5] CEF has equal access to the back-to-school night, open house, and bulletin board fora.

The issue, therefore, is whether the revised policy so interpreted moots CEF's request for permanent injunctive relief

---

**5.** In its most recent filing CEF has suggested that MCPS is ignoring this policy in practice, citing an incident at Millcreek Town Elementary School where a child attempting to distribute CEF materials was purportedly relegated to the teacher conference room. MCPS denies that any discrimination was involved and in fact contends that all exhibitors at the school were so relegated. Whatever may have occurred, the Court declines to find that this incident demonstrates that the announced policy of the Board *vis-a-vis* CEF's full access to back-to-school nights, open houses, and bulletin boards has been abandoned. At most, it suggests a disagreement over whether one school in one instance may have violated the announced policy. This seems to have been a *de minimis* episode. The Court assumes that there will be an opportunity to review the incident (and any other future incidents) internally before recourse to the Court becomes necessary.

with respect to the back-to-school night, open house, and bulletin board fora. The Court holds that it does.

In *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 & n. 11, 102 S.Ct. 1070, 71 L.Ed.2d 152 (1982), the Supreme Court held that only where it appeared likely that the legislature would enact a continuously problematic policy if a lawsuit were dismissed would a challenge to a corrective policy not be moot. The Fourth Circuit has read *City of Mesquite* and its progeny as "generally limited to the circumstance, and like circumstances, in which the defendant openly announces its intention to reenact precisely the same provision held unconstitutional below," *Valero Terrestrial Corp. v. Paige*, 211 F.3d 112, 116 (4th Cir.2000).

In the present case, MCPS has made what amounts to a judicial admission that it will respect CEF's access to the back-to-school night, open house, and bulletin board fora. Apart from that, the Court finds nothing to suggest that MCPS is likely to revert to a policy insofar as these fora are concerned that would exclude CEF or similarly situated organizations from full access. As a result, the Court views the issue of access to these fora as moot and finds no need to enter a permanent injunction in regard to them.

2) As for the take home flyer forum, the primary issue is whether MCPS's change of policy *vis-a-vis* this forum continues to impermissibly discriminate against CEF.

The Court begins with a comparison of the former practice and the revised policy.

a) The Fourth Circuit panel noted that under the former "policy (if any)," MCPS "permitted many organizations, including several religious groups, to avail themselves of the take-home flyer forum," 392 F.3d at 592. It further noted that:

[b]etween August 2001 and February 2003, the District permitted over 225 groups to access the take-home flyer forum and circulate 415 flyers. During this time, the District only denied thirty-two requests for access to this forum; of those, thirteen were excluded specifically because they were profit-driven. The approved flyers came from groups as diverse as the American Red Cross, the Shakespeare Theater, the Montgomery County Recreation Department, The American Diabetes Association, the Audubon Naturalist Society, and the Washington Gas Company. The topics of the flyers included information about community, charitable, and education-related activities, cultural and sporting events, and health issues. MCPS even permitted religious organizations access to this forum, allowing circulation of flyers from the Salvation Army, the Holy Redeemer Summer Play School, the Norbeck Community Church, the Cedar Lane Unitarian University Church, the Jewish Community Center, the Boy Scouts, the Girl Scouts, the YMCA, and the Boys and Girls Club.

*Id.* at 593.

"Given the broad access ... [MCPS] grants to other organizations, the panel concluded that a limited public forum was involved, triggering a compelling governmental interest test—which, as stated, the panel found was not satisfied." *Id.* at 594.

Accordingly, the panel reversed and remanded this Court's preliminary denial of CEF's access to the take-home flyer forum.

b) As previously indicated, however, MCPS's Informational Material and Announcement Policy, CNA, revised in July 2004, now limits the types of organization that may have access to both display and distribution directly to students—the take home flyer forum—to five, namely:

1) Montgomery County Public Schools;

2) Agencies/departments within the County, state or federal governments;

3) Parent Teacher Associations/Organizations;

4) Licensed day care operating at school campuses; and

5) Non-profit organized sports leagues.

MCPS submits that the revised policy passes constitutional muster because it is based upon speaker identity not content speech; so that even if CEF—along with many other organizations including those formerly having access to the forum—is not included, there is no free speech violation. Even then MCPS suggests that CEF is not ultimately denied access since, "[i]f CEF's flyers are sponsored and endorsed by one of the five approved organizations they can be distributed in the take home flyer forum."

CEF insists that the factual context upon which the Court of Appeals held it was entitled to injunctive relief remains unaltered. It also challenges the *bona fides* of MCPS's assertion that it may distribute its flyers if an approved group sponsors or endorses them.

As to whether the situation remains unchanged, CEF says that, in directing that CEF should have access to the take-home flyer forum, the Fourth Circuit relied upon the fact that numerous non-profit and governmental organizations were allowed to distribute flyers. Since MCPS continues to allow certain governmental and non-profit organizations to use the forum, MCPS remains out of compliance with the Fourth Circuit's directive. CEF further submits that Paragraphs C(1) to C(3) of CNA–RA require all organizations to obtain MCPS's written approval for any flyer distribution and Paragraph III D of CNA–

RA authorizes school officials to withdraw approval simply if they believe the distribution "would undermine the intention of CNA." This unbridled discretion, according to CEF, empowers MCPS to let in or keep out any organization it may choose to—CEF among them—which again constitutes an abridgement of free speech based on speech content.

As for the sponsorship or endorsement of flyers by one of the five groups approved for direct distributions to students, CEF points out that no criteria have been established for such access, in consequence of which flyers for activities similar to those that occur at CEF's Good News Clubs continue to be distributed by MCPS,[6] whereas CEF remains an outsider. In any case, says CEF, this sponsorship/endorsement policy is inconsistent with the plain language of Policy CNA and Regulation CNA–RA, which give ultimate approval authority to MCPS. The whole intent of Policy CNA, according to CEF, "has been to close [it] out of the take-home flyer forum."

MCPS replies:

The Fourth Circuit did not hold that distribution of flyers by certain community groups *per se* requires MCPS to distribute CEF's flyers. Rather, it looked to the breadth and character of the speech of the various community groups and determined that their speech was on the same topics, albeit from a different viewpoint, as that of CEF. It was for that reason that exclusion of CEF's flyers was held to be viewpoint discrimination. In marked contrast, under the revised take-home flyer policy, access to the forum is determined by the subject matter and status of the speaker, not the viewpoint of the flyer.

---

**6.** These include, for example, after-school activities for elementary school children and a program run by a religious group.

Further, MCPS disputes that the revised policy gives school principals unchecked authority "to approve virtually any flyer." Principals are only authorized to approve requests for displays or distributions at their individual schools and may only approve a request for distribution from "one of the five listed categories of organization or community groups." [7]

Moreover, the criteria by which MCPS decisionmakers may disapprove of access (or more precisely, withdraw approval of access) include whether they determine "that the display ... would undermine the intent of Policy, CNA, or could reasonably be predicted to cause substantial disruption of or material interference with, school activities." While this would presumably authorize the decisionmakers to disapprove informational materials that were obscene, lewd, immoral, or injurious to the health and safety of students, there is no suggestion that materials could be excluded based on their religious or proselytizing nature nor indeed, says MCPS, would it tolerate exclusion on that basis. Additionally, MCPS cites *Tinker v. Des Moines Indep. Com. Sch. Dist.*, 393 U.S. 503, 514, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969), in which the Supreme Court held limitations on speech in a school setting are permissible if school authorities have reasonably "forecast substantial disruption of or material interference with school activities."

Finally, MCPS defends the proposition that CEF will have access to the take-home flyer forum if its flyers are sponsored or endorsed by one of the five approved organizations. The very absence of MCPS-established criteria by which those organizations might choose to sponsor and endorse the flyers of other groups is the whole point: MCPS does not, except

insofar as it reserves the right to disapprove materials based on obscenity, lewdness, and comparable grounds, regulate the content of the speech of speakers. Its right of approval remains limited in scope. Disapproval may not be premised on the religious content of the flyers.

## V.

In *Perry Educ. Assn. v. Perry Local Educators' Assn.*, 460 U.S. 37, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983), Justice White for the Court declared that "[t]he existence of a right of access to public property and the standard by which limitations upon such a right must be evaluated differ depending on the character of the property at issue," 460 U.S. at 44, 103 S.Ct. 948.

■ The Court distinguished among fora traditionally devoted to assembly and debate, *e.g.* streets and parks, where a content-based exclusion must be narrowly drawn to serve a compelling state interest; limited public fora which the State has opened as a place for expressive activity, which are also subject to the compelling state interest test; and non-public fora, where the State "has the power to preserve the property under its control for the use to which it is lawfully dedicated," subject only to a reasonableness test. *Id.* at 46, 103 S.Ct. 948 (quoting earlier cases).

In *Perry*, the Court upheld a provision of a collective bargaining contract limiting access to the interschool mail system and teacher mailboxes in the school to an incumbent teachers' union (PEA), as opposed to a rival union (PLEA):

The school mail facilities at issue here fall within this third category [of non-public fora]. . . . [The] interschool mail system is not a traditional public fo-

---

7. System-wide distributions must be approved by the deputy superintendent/chief operating officer. Cluster-wide distributions must be approved by the appropriate community superintendent.

rum.... On this point the parties agree.... The internal mail system ... [is] not held open to the general public. It is instead PLEA's position that the school mail facilities have become a "limited public forum" from which it may not be excluded because of the periodic use of the system by private non-school connected groups, and PLEA's own unrestricted access to the system prior to PEA's certification as exclusive representative.

Neither of these arguments is persuasive.

\*     \*     \*     \*     \*     \*

[T]he schools do allow some outside organizations such as the YMCA, Cub Scouts, and other civil and church organizations to use the facilities. This type of selective access does not transform government property into a public forum.

\*     \*     \*     \*     \*     \*

Moreover, even if we assume that by granting access to [some groups], the school district has created a "limited" public forum, the constitutional right of access would in any event extend only to other entities of similar character. While the school mail facilities thus might be a forum generally open for use by ... other organizations that engage in activities of interest and educational relevance to students, they would not as a consequence be open to an organization such as PLEA, which is concerned with the terms and conditions of teacher employment.

\*     \*     \*     \*     \*     \*

[Nor does the] access policy adopted by the Perry schools favor[ ] a particular viewpoint, that of the PEA, on labor relations, [in which case it would] be strictly scrutinized regardless of whether a public forum is involved.... There is ... no indication that the school board intended to discourage one viewpoint

and advance another. We believe it is more accurate to characterize the access policy as based on the *status* of the respective unions rather than their views. Implicit in the concept of the nonpublic forum is the right to make distinctions in access on the basis of subject matter and speaker identity. These distinctions may be impermissible in a public forum but are inherent and inescapable in the process of limiting a nonpublic forum to activities compatible with the intended purpose of the property. The touchstone for evaluating these distinctions is whether they are reasonable in light of the purpose which the forum at issue serves. (Emphasis in original) (Footnotes omitted)

*Id.* at 46–49, 103 S.Ct. 948.

In *Cornelius v. NAACP Legal Defense and Ed. Fund,* 473 U.S. 788, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985), the Court followed the tripartite classification of fora of *Perry,* finding a nonpublic forum in the Combined Federal Campaign (CFC), a charitable fundraising drive conducted in federal offices, from which political and advocacy groups had been properly excluded:

The government does not create a public forum by inaction or by permitting limited discourse, but only by intentionally opening a nontraditional forum for public discourse.... Accordingly, the Court has looked to the policy and practice of the government to ascertain whether it intended to designate a place not traditionally open to assembly and debate as a public forum.... The Court has also examined the nature of the property and its compatibility with expressive activity to discern the government's intent.

\*     \*     \*     \*     \*     \*

Not every instrumentality used for communication, however, is a traditional public forum or a public forum by desig-

nation.... We will not find that a public forum has been created in the face of clear evidence of a contrary intent, nor will we infer that the government intended to create a public forum when the nature of the property is inconsistent with expressive activity.

473 U.S. at 802–03, 105 S.Ct. 3439.

The Court reaffirmed the validity of speaker-based restrictions:

The government's consistent policy has been to limit participation in the CFC to 'appropriate' voluntary agencies.... Such selective access, unsupported by evidence of a purposeful designation for public use, does not create a public forum.... Nor does the history of the CFC support a finding that the Government was motivated by an affirmative desire to provide an open forum for charitable solicitation in the federal workplace.... The historical background indicates that the Campaign was designed to minimize the disruption to the workplace that had resulted from unlimited ad hoc solicitation activities by *lessening* the amount of expressive activity occurring on federal property.... [T]he nature of the Government property involved strengthens the conclusion that the CFC is a nonpublic forum.... The federal workplace, like any place of employment, exists to accomplish the business of the employer.... It follows that the Government has the right to exercise control over access to the federal workplace in order to avoid interruptions to the performance of the duties of its employees. (Emphasis in original)

473 U.S. at 804–06, 105 S.Ct. 3439.

In both *Perry* and *Cornelius,* the Court emphasized that the standard for exclusion from the nonpublic forum was merely that of reasonableness. Limiting access to the school mail facilities in *Perry* was deemed "reasonable because it [was] wholly consistent with the district's legitimate interest in 'preserv[ing] the property ... for the use to which it is lawfully dedicated.'" 460 U.S. at 50–51, 103 S.Ct. 948. It enabled the exclusive bargaining agent to remain in contact with its teacher-members whereas the outside union had no official responsibility in connection with the school district. Exclusion of the rival union was also seen as a means of insuring labor-peace within the school. Additionally, the *Perry* Court spoke of the "substantial alternative channels of communication" available to the excluded union:

Finally, the reasonableness of the limitations on PLEA's access to the school mail system is also supported by the substantial alternative channels that remain open for union-teacher communication to take place. These means range from bulletin boards to meeting facilities to the United States mail. During election periods, PLEA is assured of equal access to all modes of communication.

\* \* \* \* \* \*

[O]n government property that has not been made a public forum, not all speech is equally situated, and the state may draw distinctions which relate to the special purpose for which the property is used.... [F]or a school mail facility, the difference in status between the exclusive bargaining representative and its rival is such a distinction.

*Id.* at 53–55, 103 S.Ct. 948.

In *Cornelius,* Justice O'Connor expanded upon the applicability of the reasonableness test in the context of nonpublic fora:

Control over access to a nonpublic forum can be based on subject matter and speaker identity so long as the distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint neutral.... Although a speaker may be excluded from a nonpublic forum if he wishes to address a topic not encompassed within the pur-

pose of the forum ... or if he is not a member of the class of speakers for whose especial benefit the forum was created ..., the government violates the First Amendment when it denies access to a speaker solely to suppress the point of view he espouses on an otherwise includible subject.

\*   \*   \*   \*   \*   \*

The Government's decision to restrict access to a nonpublic forum need only be *reasonable;* it need not be the most reasonable or the only reasonable limitation. In contrast to a public forum, a finding of strict incompatibility between the nature of the speech or the identity of the speaker and the functioning of the nonpublic forum is not mandated. \* \* \* Nor is there a requirement that the restriction be narrowly tailored or that the Government's interest be compelling. The First Amendment does not demand unrestricted access to a nonpublic forum merely because use of that forum may be the most efficient means of delivering the speaker's message .... Here, as in *Perry Education Assn.*, the speakers have access to alternative channels, including direct mail and in-person solicitation outside the workplace....

\*   \*   \*   \*   \*   \*

Here the President could reasonably conclude that a dollar directly spent on providing food or shelter to the needy is more beneficial than a dollar spent on litigation that might or might not result in aid to the needy. Moreover, avoiding the appearance of political favoritism is a valid justification for limiting speech in

·a nonpublic forum. (Emphasis in original)

473 U.S. at 806, 808–09, 105 S.Ct. 3439.

## VI.

■ In the present case, *Perry* notwithstanding, the Fourth Circuit held that the MCPS school mail facilities, at least as constituted as of the time of the appeal, amounted to a limited public forum.[8] But, in arriving at that characterization, the Fourth Circuit remarked several times upon the broad-based access that organizations had to the facilities. *Child Evangelism Fellowship of Maryland, Inc.*, 373 F.3d at 592–93. The Court finds that fact to be of critical and dispositive importance.

It is abundantly clear in light of *Perry* that limiting access to school mail facilities to a select number of organizations does not *ipso facto* transform the nonpublic forum nature of the facilities. According to *Perry*, limiting access to the facilities to "entities of similar character" is constitutionally permissible. In the present case, apart from the governmental entities—which are as content-neutral as can be imagined—the four other approved categories or organizations MCPS recognizes as eligible for the take-home flyer forum are all directly or indirectly of traditional public educational relevance to students—MCPS, PTAs, licensed day care operating on school campuses and nonprofit organized youth sports leagues. The Court is not persuaded merely because organizations such as these are granted access that CEF must be granted access as well.

Nor, as in *Perry*, can it be said that by its revised policy MCPS is intending "to discourage one viewpoint and advance an-

---

8. As previously quoted, the Supreme Court in *Perry* observed that:

    [The] schools do allow some outside· organizations such as the YMCA, Cub Scouts, and other civic and church organizations to use the facilities. This type of selective access does not transform government property into a public forum.

    460 U.S. at 47.

other." MCPS through Revised Policy CNA takes no position relative to the content of the flyers. As in *Perry*, MCPS only "make[s] distinctions in access on the basis of subject matter and speaker identity." It does not attempt to regulate the content of topics.[9]

Comparison of the present case with *Cornelius* is similarly instructive. There the Supreme Court looked to the policy and practice of the government to ascertain whether it intended to designate a place not traditionally open to assembly and debate as a public forum.... "Not every instrumentality used for communication ... is a ... public forum." 473 U.S. at 802–03, 105 S.Ct. 3439. No public forum will be found "in the face of clear evidence of a contrary intent ...." In the case at bar, prior to the adoption of Revised Policy CNA, it may be doubted whether MCPS gave any thought to whether it was creating a limited public forum, although there is little question that it subsequently denied CEF access to the school mail facilities out of fear that granting access might amount to a breach of the First Amendment's Establishment of Religion clause. But with Revised Policy CNA there can be no doubt. There is, in the words of *Cornelius*, "clear evidence of a contrary intent." MCPS has indicated that it does not wish to create a limited public forum and it no longer opposes CEF's flyers on the basis of their religious content.

The Court thus concludes that MCPS's school mail facilities, *i.e.* the vehicle through which the take-home flyer program operates, as presently constituted, is a nonpublic forum subject only to a test of reasonableness.

The Court finds that the reasonableness test is met by Revised Policy CNA. MCPS could properly choose to reduce the burgeoning number of organizations seeking to send home messages in students' backpacks. It could also limit the subject matter to activities of traditional educational relevance to students and the categories of speakers to organizations involved in those activities. Further, as in *Perry*, the reasonableness of this limitation is supported by the "substantial alternative channels of communication" that remain available to CEF, not only the bulletin boards and U.S. mail mentioned in *Perry*, but also back-to-school nights and open house displays. As noted in *Cornelius*, "the First Amendment does not demand unrestricted access to a nonpublic forum merely because use of that forum may be the most efficient means of delivering the speaker's message." 473 U.S. at 809, 105 S.Ct. 3439. Revised Policy CNA and Regulation CNA–RA, on their face, are constitutionally sound.

Justice O'Connor in *Cornelius*, it should be said, raised one additional concern of possible relevance in the present case. She noted that the exclusion of legal defense and advocacy groups from the CFC campaign would "avoid the reality and the appearance of Government favoritism or entanglement with particular viewpoints." *Id.* at 807, 105 S.Ct. 3439. On the other hand, she also noted that "the purported concern to avoid controversy excited by particular groups may conceal a bias against the viewpoint advanced by the excluded speakers." *Id.* at 812, 105 S.Ct. 3439. Accordingly, the case was remanded to the lower court to determine "whether the exclusion of respondents was impermissibly motivated by a desire to suppress

9. *Nor does the Court find MCPS's concession of access to be contrary to the plain language* of Policy CNA and Regulation CNA–RA.

a particular viewpoint." *Id.* at 812–813, 105 S.Ct. 3439. There is a suggestion throughout CEF's pleadings in the present case that suppression of its viewpoint is precisely what MCPS has set out to do,[10] a proposition which MCPS vigorously denies.

On the record before it, the Court has concluded that MCPS's take-home flyer forum, as revised, is content-neutral. The mere fact that MCPS counsel may concede that the adoption of revised Policy CNA came in response to the current litigation does not alter that conclusion. Similarly, whatever subjective belief an individual school board member may entertain about the propriety of CEF's involvement in the take-home flyer program, MCPS was undoubtedly entitled to attempt to harmonize its policy with the Fourth Circuit opinion. One option might have been to open the take-home flyer forum to all comers on all topics—a potentially unwieldy prospect— or to take the occasion to restructure and limit the program in some reasonable way, practically and constitutionally speaking. As the Court has held, there was a rational basis for MCPS's adoption of the Revised Policy CNA and Regulation CNA–RA. The categories of speakers having access to the forum have been limited and their subject matter relates to themes of traditional educational relevance. Even then, CEF will have access to the forum if any one of the approved speaker groups sponsors or endorses it. The Court therefore sees no need to entertain further discovery in the matter.[11]

Finally, there is the matter of whether permanent injunctive relief is necessary to ensure that MCPS officials will not in the future interpret its authority under Revised Policy CNA to deny indirect distribution of CEF"'s materials (*i.e.* through the five approved types of organizations) on the grounds that it would "undermine the intent of the policy." As with the permanent injunctive relief CEF seeks with respect to bulletin boards/back-to-school nights/open houses, the Court finds that MCPS has made a binding admission in its pleadings that it will not interpret the policy to discriminate against CEF in such fashion. Further, MCPS has in no way signaled that it intends to do otherwise in the future. The issue of permanent injunctive relief as to the take-home flyer forum, therefore, is MOOT.

A separate Order will be ENTERED consistent with this Opinion.

### ORDER

The Court has considered the pending Motions of the parties. Accordingly it is for the reasons set forth in the accompanying Opinion this 24th day of March, 2005

ORDERED, ADJUDGED and DECREED:

1) Revised MCPS Policy CNA and Regulation CNA–RA, which have the effect of granting CEF access to the bulletin board/back-to-school night/open house fora in the Montgomery County Public Schools but denying it direct access to the take-home flyer forum, do not violate CEF's free speech rights;

10. During oral argument, counsel for CEF referred to a newspaper report that a member of the School Board may have made a remark to this effect.

11. The Court notes that CEF has not asked to amplify the record; indeed, it seeks summary judgment on the record as it stands. While the Court is satisfied that the present record suffices to justify its conclusion and that further discovery in the case would be futile, it does not wish to cut off the possibility of CEF filing a timely motion to reconsider, demonstrating how and why it believes further discovery might be appropriate.

2) There is no indication that MCPS will revert to any policy that would otherwise exclude CEF from direct access to the first three named fora, or indirect access to the fourth named forum through any of the five categories of approved entities or organizations that do have direct access to the fourth named forum;

3) Given materially changed circumstances, the Preliminary Injunction entered in this case on April 29, 2003 [Paper No. 18] is MOOT and is therefore DISSOLVED;

4) CEF's request for permanent injunctive relief is DENIED; and it is further

ORDERED:

1) CEF's Motion for Summary Judgment [Paper No. 47] is DENIED;

2) Defendants' Motion to Dismiss [Paper No. 35] is GRANTED IN PART and DENIED IN PART:

a) Said Motion is DENIED with respect to CEF's request for attorneys fees and costs under 42 U.S.C. § 1983 in connection with their efforts to obtain preliminary injunctive relief to gain access to the MCPS take-home flyer forum from the inception of this suit through the decision of the Fourth Circuit granting Plaintiffs the right to such access. CEF shall file an appropriate petition within thirty (30) days and Defendants may respond in the usual course;

b) In all other respects, said Motion is GRANTED;

3) CEF's Motion for Permanent Injunction or in the Alternative for Preliminary Injunction as to the Take–Home Flyer Forum and a Permanent Injunction as to All Other Fora [Paper No. 56] is GRANTED IN PART and DENIED IN PART:

a) Said Motion is GRANTED on the same terms and conditions as set forth in the Ordering Paragraph 2(a), *supra;*

b) In all other respects, said Motion is DENIED.