Filed: September 14, 2006

UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

No. 05-1508
(CA-03-162-PJM)

CHILD EVANGELISM FELLOWSHIP OF MARYLAND, INCORPORATED, a Maryland not-for-profit corporation; CHILD EVANGELISM FELLOWSHIP OF NORTHWEST MARYLAND, a Maryland association,

Plaintiffs - Appellants,

versus

MONTGOMERY COUNTY PUBLIC SCHOOLS; JERRY D. WEAST, in his official capacity as Superintendent of Montgomery County Public Schools; PATRICIA O'NEILL; SHARON W. COX; KERMIT V. BURNETT; REGINALD M. FELTON; CHARLES HAUGHEY; WALTER N. LANGE; GABE ROMERO, in their official capacities as members of the Board of Education for Montgomery County,

Defendants - Appellees.

-------------------------------------------------

NATIONAL LEGAL FOUNDATION,

Amicus Supporting Appellants,

NATIONAL SCHOOL BOARDS ASSOCIATION; MARYLAND ASSOCIATION OF BOARDS OF EDUCATION,

Amici Supporting Appellees.

O R D E R

The court amends its opinion filed August 10, 2006, as follows:

On page 12, final paragraph of text, line 2 -- "CEF's policy" is corrected to read "MCPS's policy."

For the Court - By Direction

   /s/ Patricia S. Connor
          Clerk

PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

CHILD EVANGELISM FELLOWSHIP OF
MARYLAND, INCORPORATED, a
Maryland not-for-profit corporation;
CHILD EVANGELISM FELLOWSHIP OF
NORTHWEST MARYLAND, a Maryland
association,
              *Plaintiffs-Appellants,*

                    v.

MONTGOMERY COUNTY PUBLIC
SCHOOLS; JERRY D. WEAST, in his
official capacity as Superintendent
of Montgomery County Public
Schools; PATRICIA O'NEILL; SHARON
W. COX; KERMIT V. BURNETT;
REGINALD M. FELTON; CHARLES
HAUGHEY; WALTER N. LANGE; GABE
ROMERO, in their official capacities
as members of the Board of
Education for Montgomery County,
              *Defendants-Appellees.*

No. 05-1508

NATIONAL LEGAL FOUNDATION,
      *Amicus Supporting Appellants,*

NATIONAL SCHOOL BOARDS
ASSOCIATION; MARYLAND
ASSOCIATION OF BOARDS OF
EDUCATION,
      *Amici Supporting Appellees.*

Appeal from the United States District Court
for the District of Maryland, at Greenbelt.
Peter J. Messitte, District Judge.
(CA-03-162-PJM)

Argued: May 23, 2006

Decided: August 10, 2006

Before MICHAEL, MOTZ, and SHEDD, Circuit Judges.

---

Affirmed in part and reversed and remanded in part by published opinion. Judge Motz wrote the opinion, in which Judge Michael and Judge Shedd joined.

---

### COUNSEL

**ARGUED:** Kimberlee Wood Colby, CENTER FOR LAW & RELIGIOUS FREEDOM, Springfield, Virginia, for Appellants. Jonathan S. Franklin, HOGAN & HARTSON, L.L.P., Washington, D.C., for Appellees. **ON BRIEF:** Steven H. Aden, Gregory S. Baylor, Timothy J. Tracey, CHRISTIAN LEGAL SOCIETY, Springfield, Virginia; H. Robert Showers, SIMMS SHOWERS, L.L.P., Leesburg, Virginia, for Appellants. Christopher T. Handman, Jake M. Shields, HOGAN & HARTSON, L.L.P., Washington, D.C.; Judith S. Bresler, Eric C. Brousaides, REESE & CARNEY, L.L.P., Columbia, Maryland, for Appellees. Steven W. Fitschen, Colleen M. Holmes, THE NATIONAL LEGAL FOUNDATION, Virginia Beach, Virginia, for Amicus Supporting Appellants. Naomi E. Gittins, Senior Staff Attorney, Francisco M. Negrón, Jr., Thomas Hutton, Lisa Soronen, NATIONAL SCHOOL BOARDS ASSOCIATION, Alexandria, Virginia; Stephen C. Bounds, Director of Legal & Policy Services, MARYLAND ASSOCIATION OF BOARDS OF EDUCATION, Annapolis, Maryland, for Amici Supporting Appellees.

**OPINION**

DIANA GRIBBON MOTZ, Circuit Judge:

Child Evangelism Fellowship of Maryland, Inc. ("CEF"), which describes itself as a nonprofit "Bible-centered, world-wide organization composed of born-again believers whose purpose is to evangelize boys and girls with the Gospel of the Lord Jesus Christ," appeals to this court a second time. CEF once again seeks injunctive relief to obtain access to the forum established for take-home flyers in Montgomery County public elementary schools. In the first appeal, the district court denied CEF's request for injunctive relief; we reversed and remanded for further proceedings. *See Child Evangelism Fellowship of Md., Inc. v. Montgomery County Pub. Schs.*, 373 F.3d 589 (4th Cir. 2004) ("*CEF I*").

After that decision, Montgomery County Public Schools ("MCPS") enacted a new policy governing access to the take-home flyer forum. Considering this new policy on remand, the district court again refused to issue an injunction requiring MCPS to permit CEF access to this forum in order to distribute its "Good News Club" flyers. *Child Evangelism Fellowship of Md., Inc. v. Montgomery County Pub. Schs.*, 368 F. Supp. 2d 416 (D. Md. 2005) ("*CEF II*"). The district court held that MCPS's take-home flyer forum "is a nonpublic forum subject only to a test of reasonableness." *Id.* at 430. The court then concluded that the restrictions MCPS imposed on access to the forum were reasonable and did not "violate CEF's free speech rights." *Id.* at 431.

Although we affirm some of the district court's subsidiary rulings, because the unfettered discretion retained by MCPS to control access to the take-home flyer forum in its new policy does not provide adequate protection for viewpoint neutrality, we must reverse the judgment of the district court with respect to that forum.

I.

Beginning in 2001, CEF attempted to inform parents of elementary school children in Montgomery County, Maryland, about its "Good

News Club" meetings. At these meetings, held on school property after school hours, "children recite Bible verses, sing songs, play games, learn Bible stories, and pray under the leadership of trained staff who primarily are volunteers." *See CEF I*, 373 F.3d at 592. CEF sought to communicate information about the Good News Club meetings through several forums in the County's 125 elementary schools, including back-to-school nights, open houses, community bulletin boards and display tables, and each school's take-home flyer forum. *See id.* (describing content of flyers and method of distribution via the take-home flyer forums).

When MCPS denied it access to all of these various forums, CEF filed this action challenging the constitutionality of that denial and seeking injunctive relief. The district court did grant CEF some injunctive relief. The court required MCPS to provide CEF access "on the same terms that apply to other community groups" to back-to-school nights, open houses, community bulletin boards, and display tables. However, the court denied CEF's request for a preliminary injunction providing it access to the take-home flyer forum. *Id.* Although the district court recognized that controlling precedent likely compelled the conclusion that denying CEF access to this forum infringed the group's First Amendment free speech rights, it concluded that the asserted Establishment Clause "problem" caused by allowing distribution of the Good News Club flyers might ultimately "trump[ ]" CEF's free speech rights. Weighing these competing interests, the court found that CEF had not established a likelihood of success on the merits as to its claim to access the take-home flyer forum.

In *CEF I*, we initially noted that, like the district court, MCPS now recognized that excluding CEF from the take-home flyer forum infringed the group's free speech rights. Although MCPS had contended in its appellate brief that excluding CEF because of its proselytizing religious viewpoint did not constitute viewpoint discrimination, at oral argument MCPS changed its position, "conced[ing] that under controlling precedent," the exclusion was "unconstitutional viewpoint discrimination" violating CEF's First Amendment free speech rights. *Id.* at 593. We found this concession "well-taken." *Id.* at 593-94 (holding that *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98 (2001), "directly controls"). Moreover, unlike the district court, we

concluded that distribution of CEF's flyers would not violate the Establishment Clause. *Id.* at 594-602. Accordingly, we reversed the district court's denial of preliminary injunctive relief with respect to the take-home flyer forum and remanded for further proceedings.

Shortly after our decision in *CEF I*, MCPS enacted a new policy regarding distribution of materials in public elementary schools. MCPS instituted the policy for the stated purpose of distributing "informational materials and announcements" while maintaining "a learning environment free from disruption." The policy provides that "the intent of the Board of Education [is] to designate appropriate materials for display and distribution and maintain a limited nonpublic forum."

The policy provides MCPS with broad discretion over flyer distribution at three different points in the process — the "endorsement" stage, the "approval" stage, and the "withdrawal" stage. Five categories of groups may submit flyers to MCPS concerning activities that these groups "sponsor[ ] or endorse[ ]": (1) MCPS itself; (2) "[a]gencies/departments within the county, state, or federal government"; (3) "Parent Teacher Associations/organizations"; (4) licensed daycare providers operating on school campuses; and (5) "[n]onprofit organized youth sports leagues." Because "[o]nly information concerning activities sponsored or endorsed by the . . . listed organizations will be approved" by MCPS, any group that is not listed — like CEF — must obtain an endorsement if it wishes to distribute its flyers.

In addition to being one of the groups with endorsement power, MCPS is the sole entity with the authority to approve flyers for distribution. A regulation implementing the new policy requires any organization seeking to distribute a flyer to "provide the appropriate MCPS official . . . a copy of the material . . . at least 15 school days prior to distribution." All flyers must "identify[ ] . . . on the document" the name of the listed group endorsing its distribution. The policy provides that MCPS "*may* approve" any flyer submitted or endorsed by a listed group for distribution (emphasis added).

Finally, even after approving a flyer, "MCPS retains the right to withdraw approval of material from any source if it is determined that

distribution would undermine the intent of this policy." The regulation elaborates on the meaning of this withdrawal power, clarifying that MCPS officials may withdraw approval of any flyer whose distribution "would undermine the intent of [the policy] . . . or could reasonably be predicted to cause substantial disruption of, or material interference with, school activities."

MCPS moved to dismiss CEF's complaint as moot in light of this new policy. CEF responded by moving for summary judgment. It sought a declaration that MCPS violated the First Amendment by excluding it from, and a permanent injunction requiring its admission to, the take-home flyer forum. CEF also sought a permanent injunction regarding the forums to which the district court previously had granted it preliminary injunctive relief — back-to-school nights, open houses, community bulletin boards, and display tables. Additionally, CEF requested costs, attorneys' fees, and nominal damages.

After hearing argument, the district court entered an order denying CEF's request for a permanent injunction and dissolving as moot, in light of the new policy, the existing preliminary injunction as to the various non-flyer forums. The court also denied CEF's motion for summary judgment, and granted MCPS's motion to dismiss as moot the remainder of the case, with the exception of CEF's request to recoup fees and costs for litigation up to the time of our previous decision. In the opinion accompanying this order, the district court explained its reasoning: in its view, the take-home flyer forum was a "nonpublic forum subject only to a test of reasonableness," and MCPS had reasonably limited access to this forum. *CEF II*, 368 F. Supp. 2d at 430-31.

CEF noted a timely appeal in which it contends that the district court erred in denying injunctive relief and in holding that MCPS's new policy regulating access to the take-home flyer forum did not violate CEF's First Amendment rights.[1]

---

[1]CEF also briefly argues on appeal that the district court erred in holding that MCPS's new policy mooted CEF's claims for relief as to the other forums — back-to-school nights, open houses, community bulletin boards, and display tables — and to nominal damages. We reject both

## II.

No party disputes that the Good News Club flyers constitute a form of speech protected by the First Amendment. However, "the government need not permit all forms of speech on property that it owns and controls." *Int'l Soc'y for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 678 (1992) ("ISKCON"). Rather, "[t]he existence of a right of access to public property and the standard by which limitations upon such a right must be evaluated differ depending on the character of the property at issue." *Perry Educ. Ass'n v. Perry Local Educators Ass'n*, 460 U.S. 37, 44 (1983). The Supreme Court "has adopted a forum analysis as a means of determining when the Government's interest in limiting the use of its property to its intended purpose outweighs the interest of those wishing to use the property for other purposes." *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 800 (1985). Therefore, we begin by briefly setting forth this forum analysis and the principles applicable to the take-home flyer forum at issue here.

## A.

The Supreme Court has recognized several types of forums. The first is the traditional public forum: "places which by long tradition or by government fiat have been devoted to assembly and debate," such as streets and parks. *Perry*, 460 U.S. at 45. In the traditional public forum, "the rights of the State to limit expressive activity are

---

contentions and affirm the judgment of the district court with respect to both. As to the other forums, the record establishes, and the district court found, that CEF enjoys equal access to them under the new policy, thus mooting the need for permanent injunctive relief with respect to the other forums. Moreover, we deny CEF's motion to supplement the record on this question with materials not before the district court. With respect to the nominal damages claim, the district court did not deny nominal damages because of mootness, as CEF contends on appeal, but rather because it found that MCPS was entitled to sovereign immunity. *See CEF II*, 368 F. Supp. 2d at 421-22. CEF does not challenge that holding on appeal and so has abandoned any objection to it. *See* Fed. R. App. P. 28(a)(9); *Williams v. Giant Food, Inc.*, 370 F.3d 423, 430 n.4 (4th Cir. 2004).

sharply circumscribed"; the state may only enact content-neutral "time, place, and manner" restrictions or content-based rules that are "necessary to serve a compelling state interest" and "narrowly drawn to achieve that end." *Id.*

A second type of forum — the nonpublic forum — consists of "[p]ublic property which is not by tradition or designation a forum for public communication." *Id.* at 46. To maintain a nonpublic forum, the government must employ "selective access" policies, whereby forum participation is governed by "individual, non-ministerial judgments." *Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 680 (1998); *see also Cornelius*, 473 U.S. at 804. The government may be more restrictive in its regulation of speech in a nonpublic forum than in a traditional public one. In addition to the ability to enact content-neutral time, place, and manner restrictions, the government may also "reserve the [nonpublic] forum for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view." *Perry*, 460 U.S. at 46.[2]

A third category lies in between, and is a hybrid of, the other two forums. This type of forum is "created by government designation of a place or channel of communication for use by the public at large for assembly and speech, for use by certain speakers, or for the discussion of certain subjects." *Cornelius*, 473 U.S. at 802. It may be of either "a limited or unlimited character." *ISKCON*, 505 U.S. at 678. The government cannot create such a forum "by inaction or by permitting limited discourse, but only by intentionally opening a nontraditional forum for public discourse." *Cornelius*, 473 U.S. at 802. The Supreme Court has sometimes referred to these intermediate forums as "designated public" forums, *see, e.g.*, *United States v. Am. Library Ass'n, Inc.*, 539 U.S. 194, 206 (2003); *Forbes*, 523 U.S. at 677-79;

---

[2]Of course, when the government alone speaks, it need not remain neutral as to its viewpoint. *See Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 833 (1995) ("When the University determines the content of the education it provides, it is the University speaking, and we have permitted the government to regulate the content of what is or is not expressed when it is the speaker or when it enlists private entities to convey its own message.").

*Lamb's Chapel v. Center Moriches Union Free Sch. Dist.*, 508 U.S. 384, 392 (1993); *ISKCON*, 505 U.S. at 678, but at other times the Court has used the phrase "limited public" forum to describe this category, *see, e.g.*, *Am. Library Ass'n*, 539 U.S. at 206; *Good News Club*, 533 U.S. at 105-06; *Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 303-04 (2000); *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995); *Cornelius*, 473 U.S. at 804, 811; *Perry*, 460 U.S. at 47-48; *Widmar v. Vincent*, 454 U.S. 263, 272 (1981); *Heffron v. Int'l Soc'y for Krishna Consciousness, Inc.*, 452 U.S. 640, 655 (1981).

Although the Court has never squarely addressed the difference between a designated public forum and a limited public forum, its most recent opinions suggest that there indeed is a distinction. In a limited public forum, the government creates a channel for a specific or limited type of expression where one did not previously exist. In such a forum, "the State may be justified in reserving [its forum] for certain groups or for the discussion of certain topics," subject only to the limitation that its actions must be viewpoint neutral and reasonable. *Good News Club*, 533 U.S. at 106-07 (quoting *Rosenberger*, 515 U.S. at 829) (internal quotation marks omitted) (alteration in original). In a designated public forum, by contrast, the government makes public property (that would not otherwise qualify as a traditional public forum) generally accessible to all speakers. In such a forum, regulations on speech are "subject to the same limitations as that governing a traditional public forum" — namely, strict scrutiny. *ISKCON*, 505 U.S. at 678-79.[3]

---

[3]Given these recent precedents, many of our sister circuits have held that a limited public forum, a forum opened only to certain speakers or for discussion of certain subjects, is in fact a subset of the larger category of designated public forums specifically opened by the government for use by all speakers. *See, e.g.*, *Bowman v. White*, 444 F.3d 967, 976 (8th Cir. 2006); *Make the Road by Walking, Inc. v. Turner*, 378 F.3d 133, 143 (2d Cir. 2004); *Donovan v. Punxsutawney Area Sch. Bd.*, 336 F.3d 211, 225 (3d Cir. 2003); *Chiu v. Plano Indep. Sch. Dist.*, 260 F.3d 330, 346 n.12 (5th Cir. 2001); *Hopper v. City of Pasco*, 241 F.3d 1067, 1074 (9th Cir. 2001); *Chabad-Lubavitch of Ga. v. Miller*, 5 F.3d 1383, 1391 n.13 (11th Cir. 1993) (implying, but not holding, that limited public forums are a subset of designated public forums). *But see Ridley v. Mass. Bay Transp. Auth.*, 390 F.3d 65, 76 n.4 (1st Cir. 2004) (equating limited public forum with nonpublic forum); *Summum v. City of Ogden*, 297 F.3d 995, 1002 n.4 (10th Cir. 2002) (treating limited public forums as a species of nonpublic forums).

To recapitulate, in a traditional public forum the government may only establish content-neutral "time, place, and manner" restrictions or content-based rules that are "necessary to achieve a compelling state interest" and are "narrowly drawn to achieve that interest." *Perry*, 460 U.S. at 45. A designated public forum is "subject to the same limitations as that governing a traditional public forum." *ISKCON*, 505 U.S. at 678. In a limited public forum, however, the government may restrict access to "certain groups" or to "discussion of certain topics," subject to two limitations: the government restrictions must be both reasonable and viewpoint neutral. *Good News Club*, 533 U.S. at 106-07. Finally, in a nonpublic forum the government may employ a "selective access" policy in which "individual non-ministerial judgments" govern forum participation, again subject to the same two limitations: the policy must be reasonable and viewpoint neutral. *Forbes*, 523 U.S. at 680; *see also Perry*, 460 U.S. at 46.

Thus, while the Constitution imposes more severe restrictions on government regulation of private speech in a traditional public forum or a designated public forum than in a limited public forum or a nonpublic forum, even in the last two categories, government restrictions on private speech must be both reasonable and viewpoint neutral.

### B.

The district court held that the take-home flyer forum was "a nonpublic forum subject only to a test of reasonableness" and that MCPS's new policy reasonably limited access to this forum to groups whose announcements "relate[ ] to themes of traditional educational relevance." *CEF II*, 368 F. Supp. 2d at 431.

CEF vehemently contends that the court erred in characterizing the flyer forum as a nonpublic forum. As the Supreme Court opined in response to a similar contention in *Lamb's Chapel*, 508 U.S. at 391, there is "considerable force" to this argument. Although the MCPS policy states that it intends to create a "nonpublic forum," it is what the government does, and "the nature of the governmental property and its compatibility with expressive activity," rather than self-serving statements, that a court examines in determining the nature of a forum. *Cornelius*, 473 U.S. at 802. MCPS created the new policy and has used the flyer forum to provide a method to facilitate, without dis-

ruption, communication of "informational material or announcements" from certain governmental speakers *and* community groups to parents of elementary school children. Thus, the take-home flyer forum would seem to be a limited public forum, *i.e.*, a "public forum . . . created by government designation of a place or channel of communication . . . for use by certain speakers, or for the discussion of certain topics." *Cornelius*, 473 U.S. at 802; *see also Good News Club*, 533 U.S. at 106.

However, like the Supreme Court in *Lamb's Chapel*, 508 U.S. at 391-92, we "need not rule on this issue." This is so because, even if the district court accurately characterized the flyer forum as nonpublic and the record supported its finding that MCPS reasonably limited the forum to groups whose announcements involve "themes of traditional educational relevance,"[4] *CEF II*, 368 F. Supp. 2d at 431, the district court clearly erred in another — and determinative — respect in its forum analysis. The district court held that as a nonpublic forum, the take-home flyer forum was "subject only to the test of reasonableness." *CEF II*, 368 F. Supp. 2d at 430. Actually, as MCPS expressly concedes, even in a nonpublic forum, government regulation must be not only reasonable but also viewpoint neutral.

The district court relied on *Perry* and *Cornelius* in concluding that the policy need only be reasonable. However, rather than "emphasiz-[ing] that the standard for exclusion from the nonpublic forum was merely that of reasonableness," as the district court believed, *CEF II*, 368 F. Supp. 2d at 428, those cases make clear that viewpoint neutrality is required even in a nonpublic forum. *See Cornelius*, 473 U.S. at 806 ("Control over access to a nonpublic forum can be based on subject matter and speaker identity so long as the distinctions drawn are

---

[4]We question the basis for this finding. Nothing in the record establishes that "traditional educational relevance" is a criterion for admission to the forum. Moreover, many groups not granted access by the policy would seem to have as much "educational relevance" as at least two of the five groups specifically listed in the policy (day care providers and sports leagues). Finally, the district court's finding ignores the endorsement mechanism in the MCPS policy, which permits any of the listed groups to endorse or sponsor the flyer of any other group, regardless of "educational relevance."

reasonable in light of the purposes served by the forum *and are viewpoint neutral*." (emphasis added)); *Perry*, 460 U.S. at 46 (holding that in a nonpublic forum "the regulation on speech [must be] reasonable *and not an effort to suppress expression merely because public officials oppose the speaker's view*" (emphasis added)); *see also Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 615 n.10 (1998) (Souter, J., dissenting) ("Like this case, *Rosenberger* involved viewpoint discrimination, *and we have made it clear that such discrimination is impermissible in all forums, even nonpublic ones* . . . ." (emphasis added)).

Moreover, viewpoint neutrality requires not just that a government refrain from explicit viewpoint discrimination, but also that it provide adequate safeguards to *protect* against the improper exclusion of viewpoints. *See Bd. of Regents v. Southworth*, 529 U.S. 217, 235 (2000) (directing remand as to one portion of a forum access policy (the student referendum for funding) because it was "unclear . . . what protection, if any, there is for viewpoint neutrality"); *Santa Fe Indep. Sch. Dist.*, 530 U.S. at 304-05 (holding that "[l]ike the student referendum for funding in *Southworth*" the student election system at issue provided "insufficient safeguards [for] diverse student speech"); *see also Forsyth County v. Nationalist Movement*, 505 U.S. 123, 133 n.10 (1992); *Lewis v. Wilson*, 253 F.3d 1077, 1080 (8th Cir. 2001).[5]

With these principles in mind, we turn to the central question in this case — does MCPS's policy regulating access to the take-home flyer forum protect against viewpoint discrimination?

---

[5]MCPS ignores all of these authorities, except *Southworth*, and incorrectly asserts that the Supreme Court's directive in *Southworth* is "dicta." Brief of Appellee at 39. The Supreme Court would not have had to remand in *Southworth* if it did not regard "protection . . . for viewpoint neutrality" as a constitutional requirement; thus its *Southworth* directive was hardly dicta. Moreover, contrary to MCPS's further representation that the viewpoint neutrality of the *Southworth* policy was never resolved on remand, actually the Seventh Circuit did resolve this question. *See Southworth v. Bd. of Regents*, 307 F.3d 566 (7th Cir. 2002). The court upheld most of the challenged policy as sufficiently limiting discretion but invalidated one portion of the policy because it granted decision makers unbridled discretion and so permitted viewpoint discrimination. *Id.* at 592.

III.

In support of its contention that the MCPS policy is not viewpoint neutral, CEF offers two arguments. The first is unconvincing, but the second has merit.

A.

Initially, pointing to its continued exclusion from the take-home flyer forum despite the access afforded to other assertedly similar groups, CEF contends that nothing has really changed since the time of the prior appeal. At the time of that first appeal, MCPS concededly engaged in viewpoint discrimination, thereby violating CEF's free speech rights, when it excluded CEF from the forum. CEF now argues that its present exclusion from the forum necessarily means that MCPS must still be engaged in viewpoint discrimination.

The basic difficulty with this argument is that circumstances have changed since the time of the prior appeal. At that time, MCPS had no discernible policy governing access to the take-home flyer forum. *See CEF I*, 373 F.3d at 592. At that time, MCPS admitted that it refused to distribute CEF's flyers because of the group's evangelical proselytizing mission. And, at that time, MCPS even acknowledged that its exclusion of the Good News Club flyers constituted viewpoint discrimination violating CEF's free speech rights. *Id.* at 594. In the prior appeal, MCPS simply argued that the Establishment Clause justified this viewpoint discrimination — an argument that we rejected. *Id.* at 594-602. The present appeal arises in a very different context. MCPS has now instituted a written policy regulating access to the flyer forum. MCPS acknowledges that it will not endorse CEF or another religious group but represents that if a listed organization sponsors or endorses flyers from any religious group, then it will distribute those flyers via the take-home forum; MCPS contends that this commitment demonstrates that it no longer engages in viewpoint discrimination.

Nevertheless, CEF maintains that precedent requires that we hold that the policy permits viewpoint discrimination because

> the Supreme Court employs an objective, direct analysis to determine whether a religious speaker has been unconstitutionally excluded. In *Lamb's Chapel*, *Rosenberger*, and *Good News Club*, the Supreme Court simply examined whether any other group permitted access to the forum was similar to the religious group or addressed a similar topic. A match triggered access for the religious group.

Reply Brief at 19. We are not persuaded that precedent requires such a conclusion.

In *Lamb's Chapel*, *Rosenberger*, and *Good News Club*, the Supreme Court did not rely solely on an "objective" comparison of included and excluded groups in determining whether a governmental forum access policy was viewpoint neutral. The history of the forum and a comparison of the characteristics of the included and excluded groups were, of course, relevant to the Court in these cases, but they were not determinative. Rather, in each case the Court found that the challenged governmental policies violated the First Amendment's Free Speech Clause because the policies permitted viewpoint discrimination.

Thus, if MCPS established an access policy that was reasonable and eliminated viewpoint discrimination, we would hold that it did not violate CEF's free speech rights whether or not CEF thereby gained admission to the take-home flyer forum. It is entirely proper for a governmental entity to attempt to conform its policies to the demands of the First Amendment. Even when litigation prompts the change, if a revised policy passes constitutional muster, a court will not penalize the government for transgressions under an earlier policy. *See, e.g.*, *DiLoreto v. Downey Unified Sch. Dist. Bd. of Educ.*, 196 F.3d 958, 970 (9th Cir. 1999).

But to withstand constitutional scrutiny under the Free Speech Clause, the government's access policy also must provide safeguards sufficient to ensure viewpoint neutrality. That is the rub in this case.

### B.

CEF contends that the new policy does not provide such safeguards because it gives MCPS unfettered discretion to deny access to the

take-home flyer forum for any reason at all — including viewpoint discrimination. We find this argument compelling.

The Supreme Court has long held that the government violates the First Amendment when it gives a public official unbounded discretion to decide which speakers may access a traditional public forum. *See, e.g.*, *Forsyth County*, 505 U.S. at 129-33; *City of Lakewood v. Plain Dealer Pub. Co.*, 486 U.S. 750, 769-72 (1988); *Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 150-51 (1969). Such unbridled discretion threatens two specific harms in the First Amendment context. First, its existence, "coupled with the power of prior restraint, intimidates parties into censoring their own speech, even if the discretion and power are never actually abused." *Lakewood*, 486 U.S. at 757. Second, "the absence of express standards" renders it difficult to differentiate between a legitimate denial of access and an "illegitimate abuse of censorial power." *Id.* at 758.

The danger of such boundless discretion, therefore, is that the government may succeed in unconstitutionally suppressing particular protected speech by hiding the suppression from public scrutiny. As the Supreme Court has explained, "[a] government regulation that allows arbitrary application . . . has the potential for becoming a means of suppressing a particular point of view." *Forsyth County*, 505 U.S. at 130 (internal quotation marks omitted); *see also Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 553 (1975) ("[T]he danger of censorship and of abridgment of our precious First Amendment freedoms is too great where officials have unbridled discretion over a forum's use.").

Although the Supreme Court has not yet had occasion to apply the unbridled discretion doctrine outside the context of a traditional public forum, the dangers posed by unbridled discretion — particularly the ability to hide unconstitutional viewpoint discrimination — are just as present in other forums. Thus, there is broad agreement that, even in limited public and nonpublic forums, investing governmental officials with boundless discretion over access to the forum violates the First Amendment. *See, e.g.*, *Atlanta Journal & Constitution v. City of Atlanta Dep't of Aviation*, 322 F.3d 1298, 1306-07, 1310-11 (11th Cir. 2003); *DeBoer v. Village of Oak Park*, 267 F.3d 558, 572-74 (7th Cir. 2001); *Lewis v. Wilson*, 253 F.3d 1077, 1079-80 (8th Cir. 2001); *Summum v. Callaghan*, 130 F.3d 906, 919-20 (10th Cir. 1997);

*Sentinel Commc'ns Co. v. Watts*, 936 F.2d 1189, 1200 n.11 (11th Cir. 1991). *See also Southworth v. Bd. of Regents*, 307 F.3d 566, 575-80 (7th Cir. 2002) (holding that unbridled discretion inquiry is a component of viewpoint discrimination analysis, which applies in all forums).

This does not mean that the unbridled discretion analysis is precisely the same when a limited public or nonpublic forum, rather than a traditional public forum, is involved. The unbridled discretion inquiry is "not [a] static inquir[y], impervious to context"; rather, a court will review a grant of discretion "in light of the characteristic nature and function of that forum." *Ridley v. Mass. Bay Transp. Auth.*, 390 F.3d 65, 94-95 (1st Cir. 2004). "[T]hat discretionary access is a defining characteristic of the nonpublic forum suggests that more official discretion is permissible in a nonpublic forum than would be acceptable in a public forum," but even so, this does not "insulate" restrictions on nonpublic or limited public forums "from an unbridled discretion challenge." *Griffin v. Sec'y of Veterans Affairs*, 288 F.3d 1309, 1324 (Fed. Cir. 2002). For this reason, even in cases involving nonpublic or limited public forums, a policy (like the one at issue here) that permits officials to deny access for any reason, or that does not provide sufficient criteria to prevent viewpoint discrimination, generally will not survive constitutional scrutiny. *See, e.g.*, *Atlanta Journal & Constitution*, 322 F.3d at 1311; *Southworth*, 307 F.3d at 592; *Lewis*, 253 F.3d at 1080; *Summum*, 130 F.3d at 920; *Sentinel*, 936 F.2d at 1199-1200.[6]

MCPS does not argue to the contrary. It does not assert that the unbridled discretion doctrine is for some reason inapplicable here. Nor does it argue that limitations on official discretion are unneces-

---

[6]Indeed, we have found only one instance in which a sister circuit has upheld a broad grant of discretion in a nonpublic forum (the National Cemetery); that was because the court specifically concluded that the "government's own expressive purposes" could not "be accomplished without vesting a significant amount of discretion" in government officials. *Griffin*, 288 F.3d at 1325. MCPS does not contend that it needs unbridled discretion to determine which private speakers will be permitted access to accomplish its own expressive purposes, and the record provides no basis for such a holding.

sary to safeguard against viewpoint discrimination. What MCPS does instead is somewhat mystifyingly contend that its policy "involves the complete absence of discretion" and that "now unlike before, *MCPS does not include or exclude flyers based on its assessment of the viewpoints they express*." Brief of Appellee at 30 (emphasis in original). Although MCPS iterates and reiterates these sentiments throughout its brief, *see, e.g.*, *id.* at 3, 12, 21, 22, 31, 33, and 37, the record offers scant support for them.

Indeed, the plain language of the policy belies these claims. The policy expressly provides MCPS with virtually unlimited discretion to control access to the flyer forum. First, as noted above, the policy endows MCPS with discretion to approve all flyers. The policy provides that MCPS "may approve . . . for distribution" flyers "from" or "sponsored or endorsed by" five groups of "listed organizations." Moreover, the policy imposes *no* guidelines as to how MCPS should exercise this unlimited discretion. This unbridled discretion requires that we sustain CEF's challenge to the policy.[7]

Moreover, even if the new policy required MCPS to approve any flyer that received endorsement, the policy would not withstand constitutional scrutiny. This is so because the policy also provides MCPS with unlimited power to withdraw approval of any flyer that it determines somehow "undermine[s] the intent of the policy." The only stated, or discernible, "intent of the policy" is to establish a forum for communications from various community groups and governmental agencies to parents without disrupting the educational environment. Limiting MCPS's power to withdraw approval of those flyers that it determines "undermine" this broad "intent" actually provides no limitation at all, *i.e.*, no meaningful restraint on MCPS's discretion to

---

[7]Surprisingly, the parties seem to read the policy to *require* MCPS to approve any flyer that receives endorsement. But this is not what the policy says — it explicitly states that MCPS "*may* approve" a flyer (emphasis added). And a regulation implementing the policy amplifies that a request for MCPS approval must be made in writing fifteen days in advance of any distribution and must be accompanied by a copy of the proposed flyer. Two weeks advance notification of this sort would seem unnecessary if MCPS were compelled to approve distribution of an endorsed flyer.

withdraw approval of a flyer for any reason it chooses, including viewpoint discrimination. Thus, even without approval authority, MCPS's broad withdrawal authority permits it the unbridled discretion to trump the decisions of any endorsing organization for any reason whatsoever.[8]

Put simply, notwithstanding the vehemence of MCPS's protestations, *nothing* in the policy prohibits viewpoint discrimination, requires viewpoint neutrality, or prevents exclusion of flyers based on MCPS's assessment of the viewpoint expressed in a flyer. *Compare Southworth*, 307 F.3d at 587-88 (upholding regulations that "express-[ly] . . . prohibit[ ] viewpoint discrimination" and that require officials to "abide by the principle of viewpoint neutrality"). We recognize that the district court seemed to believe that MCPS limited the subject matter of the flyer forum to "themes of traditional educational relevance," *CEF II*, 368 F.Supp. at 431. But nothing in the policy itself or the record in this case supports such a finding. *See supra* note 4. Similarly, the district court believed that MCPS "no longer opposes CEF's flyers on the basis of their religious content." *Id.* at 430. Even if the undisputed evidence supported this finding, and CEF maintains that it does not, nothing in the policy obliges MCPS to adhere to such a limitation in the future.

MCPS's failure to appreciate the absolute discretion it reserves to itself in its policy may be the reason it mistakenly relies on our recent decision in *ACLU v. Mote*, 423 F.3d 438 (4th Cir. 2005). In *Mote* we upheld a university policy that permitted only members of the university community or groups they sponsored to distribute literature in certain areas of the campus. The critical difference between *Mote* and the case at hand is that in *Mote* the university did *not* reserve to itself

---

[8]We note that the policy also permits MCPS to withdraw approval of a flyer that "could reasonably be predicted to cause substantial disruption of, or a material interference with, school activities." As CEF concedes, this alternative ground for withdrawal does provide an administrable standard guiding MCPS's discretion, and thus accords with the First Amendment. A policy providing forum access only to reasonably chosen viewpoint neutral speakers and limiting MCPS's withdrawal power to flyers that "could reasonably be predicted to cause substantial disruption," etc., might well withstand constitutional scrutiny.

discretion to *deny access* for any reason it chose. Rather, in *Mote*, "[l]ack of available space [wa]s the *only* acceptable reason" for the university to deny access. *Id.* at 442 (emphasis added). Thus, in sharp contrast to the approval and withdrawal powers in the MCPS policy at issue here, the policy challenged in *Mote* permitted the government no discretion to deny access to certain designated groups or to those they sponsored because of viewpoint. For this reason, *Mote* provides no support for MCPS's defense of the absolute discretion it reserves to itself in the policy at issue here.[9]

In sum, we hold that the nature and function of the take-home flyer forum cannot justify the unbounded discretion retained by MCPS to determine access to it. The flyer forum is designed to facilitate communications from various groups to parents while retaining "a learning environment free from disruption." The record reveals that even after institution of the new policy the flyer forum has functioned to provide information to parents from a very wide number and variety

---

[9]The only viewpoint discrimination challenge in *Mote* was to the university's decision on a single occasion to make an exception to the policy and *permit* (not deny) access to a nondesignated group — a challenge we rejected. *See Mote*, 423 F.3d at 445. CEF makes no equivalent challenge here. We recognize that because the *Mote* policy contained an endorsement mechanism, which we upheld, it would seem to bear on the legitimacy of the endorsement mechanism in the MCPS policy. But given our holding that the policy at issue here impermissibly reserves to MCPS the unbridled discretion to approve or withdraw approval of flyers, we do not consider the constitutionality of the endorsement mechanism absent these grants of unbridled discretion. We note that in *Mote* we similarly had no occasion to determine whether the endorsement mechanism itself violated the First Amendment by providing unbridled discretion to members of the university community. Moreover, the *Mote* mechanism differed markedly from MCPS's. For example, the *Mote* endorsement mechanism did not apply to the most trafficked areas of the campus and, in fact, the university imposed no restrictions on speaking or distributing literature in those areas (other than a pre-registration requirement). *See id.* at 442, 445. Thus, the *Mote* policy was not "a total ban of speech by the general public" but "merely a time, place and manner restriction." *Id.* at 445. Here, of course, MCPS provides no way for an outside speaker to access the flyer forum without endorsement (either by MCPS or some other group).

of groups. Permitting MCPS unbridled discretion to deny access to the oft-used forum — for any reason at all, including antipathy to a particular viewpoint — does not ensure the requisite viewpoint neutrality. But MCPS's interests in avoiding "disruption" certainly do justify it in imposing, if it chooses, some restrictions on access to the flyer forum. MCPS could restrict the number or content of messages in the forum, if done in a viewpoint neutral and reasonable manner. MCPS also could enact a policy truly reserving the forum for communications by certain categories of speakers, provided, again, that those categories were viewpoint neutral and reasonable. MCPS could also reserve the flyer forum solely for government messages, eliminating private speech altogether.

What MCPS cannot do is what it has done here: assertedly limit access to certain purportedly neutral speakers but actually reserve to itself unbridled discretion to permit or deny access to any speaker for any reason it chooses. This policy utterly fails to provide adequate protection for viewpoint neutrality. *See Southworth*, 529 U.S. at 235. Because the policy offers no protection against the discriminatory exercise of MCPS's discretion, it creates too great a risk of viewpoint discrimination to survive constitutional scrutiny. We must therefore reverse the judgment of the district court with respect to the take-home flyer forum.

## IV.

Our holding that the MCPS policy violates the First Amendment implicates three orders of the district court: (1) denial of CEF's motion for summary judgment; (2) denial of CEF's request for a permanent (or, in the alternative, preliminary) injunction; and (3) grant of MCPS's motion to dismiss. For the reasons stated within, we reverse each of these orders to the extent that it concerns the take-home flyer forum, and remand the case for further proceedings consistent with this opinion.

*AFFIRMED IN PART AND REVERSED*
*AND REMANDED IN PART*